IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

TAURUS IP, LLC,

                         Plaintiff,

          v.

DAIMLERCHRYSLER CORPORATION,
DAIMLERCHRYSLER COMPANY, LLC,
MERCEDES-BENZ USA, INC.,
CHRYSLER, LLC,
CHRYSLER HOLDING, LLC and
CHRYSLER FINANCIAL, LLC,

                         Defendants.

OPINION and ORDER

07-cv-158-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MERCEDES-BENZ USA, INC and
DAIMLERCHRYSLER COMPANY, LLC,

                    Third Party Plaintiffs,

          v.

TAURUS IP, LLC, ORION IP, LLC,
PLUTUS IP WISCONSIN, LLC, and
ERICH SPANGENBERG,[1]

---

     [1]The original caption has been amended to incorporate plaintiff's addition of three new defendants in its third amended complaint (reflecting changes in certain defendants' corporate structure) and to omit Constellation IP, LLC or Plutus IP, LLC as third party

Third Party Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In this civil action for monetary, injunctive and declaratory relief, plaintiff Taurus IP, LLC alleges infringement by defendants DaimlerChrysler Corporation, DaimlerChrysler Company, LLC, Mercedes-Benz USA, Inc., Chrysler, LLC, Chrysler Holding, LLC and Chrysler Financial, LLC of their United States Patent No. 6,141,658 (the '658 patent). The '658 patent is entitled "Computer System and Method for Managing Sales Information."

In response, defendants have asserted affirmative defenses and counterclaims for breach of contract by plaintiff and third party defendants Orion IP, LLC, Plutus IP Wisconsin, LLC and Erich Spangenberg on the basis of a licensing agreement made between defendants and third party defendant Orion IP for the settlement of an earlier lawsuit between those parties.

This case involves only a few issues, and could be a simple case. Plaintiff Taurus IP, LLC has alleged infringement by defendants of a handful of claims in the '658 patent and defendants have asserted counterclaims for breach of contract on the basis of a licensing agreement. Not content with simplicity, the parties have engaged in continuous bickering,

_____

defendants because defendants are no longer asserting any claims against these entities.

filing a small mountain of motions in which they argue the same substantive issues repeatedly, making up in volume for what they lack in clarity. Jurisdiction is present. 28 U.S.C. §§ 1331 and 1338(a).

Now before the court are eleven motions of various types that can be sorted into roughly two groups: ten are related to defendants' breach of contract claims and affirmative defenses and one is related to the merits of plaintiff's patent infringement claims. Before describing the motions, a little background is required.

In October, this court addressed a host of separate (but again mostly repetitive) motions filed by plaintiff and third party defendants to dismiss third party defendants for lack of personal jurisdiction and to dismiss defendants' counterclaims for failure to state a claim. Among other things, I concluded that (1) defendants had established a prima facie case that plaintiff and third party defendants were alter egos of one another and subject to this court's exercise of personal jurisdiction; (2) defendants had stated a claim for breach of contract on the basis of a warranty provision found in a licensing agreement made between defendants and third party plaintiff Orion IP; (3) certain license, release and third-party provisions found in the licensing agreement did not apply to defendants; and (4) defendants had failed to state a claim for fraudulent inducement or conspiracy. Dkt. #212 at 20-23, 36-37, 40-41.

At the same time, in a separate order, I granted plaintiff leave to file a third amended

3

complaint for the narrow purpose of reflecting changes in defendants' corporate structure. No sooner had plaintiff filed its third amended complaint and defendants filed their amended answer and counterclaim than problems ensued.  In their amended answers and counterclaims, defendants eliminated their claims of fraudulent inducement and civil conspiracy in accordance with this court's order but left in an affirmative defense that plaintiff's claims were licensed, in spite of this court's conclusion that the license, release and third party provisions of the licensing agreement did not apply to defendants.

In the wake of plaintiffs' third amended complaint, defendants filed a motion to supplement their amended counterclaims to include additional claims for breach of contract on the basis of separate lawsuits filed elsewhere related to separate patents.  Dkt. #201.

Next, defendants moved for summary judgment on plaintiffs' infringement claims, relying on their affirmative defenses that plaintiff's infringement claims are licensed.  Dkt. #156.  Plaintiff filed a motion for leave to file a surreply to this motion, repeating the same arguments it raised in its opposition brief.  Dkt. #203.  (Although defendants' motion for summary judgment was filed before plaintiff amended its complaint on technical grounds, defendants have confirmed that they are still seeking summary judgment on the same grounds.  Dkt. #321 at 1.  Plaintiff does not suggest that its amendment requires defendants to file a new motion.)

Plaintiff and third party defendants then filed their own motion for summary

4

judgment on defendants' affirmative defenses and related claims of breach of contract (dkt. #235).  However, plaintiff and third party defendants did not stop at that.  They filed a new round of motions to dismiss on exactly the same issues (dkt. ##270, 284).  To top it off, third party defendant Erich Spangenberg has filed a second motion to dismiss for lack of personal jurisdiction (dkt. #280).

Finally, in relation to plaintiff's motion for summary judgment, defendants have filed a motion to strike certain statements found in plaintiff's response to defendants' proposed findings of fact and reply brief in support of its motion for summary judgment (dkt. #359); many of the statements to strike are related to allegations that arise in defendants' proposed supplemental counterclaims.  This motion has ignited another battle, with plaintiff attempting to move for sanctions within its response brief (dkt. #370) and defendants moving for leave to file a reply brief (dkt. #381).

The only other motion on the agenda is defendants' motion for summary judgment on plaintiff's infringement claim (dkt. #286), in which they contend both that their products do not infringe and that the patent claims asserted are invalid as anticipated.

Although there are eleven motions before the court, they concern only three substantive issues: breach of contract, patent infringement and patent invalidity.  Before getting to these issues, several of the parties' subsidiary motions may be resolved with little discussion.

A. <u>Plaintiff and Third Party Defendants' Motions to Dismiss Defendants' Breach of</u>
<u>Contract Claims and Affirmative Defenses (dkt. ##270, 284)</u>

Most of the motions now before the court were brought by plaintiff and third party defendants. Upon reviewing these motions, I am persuaded that certain filings are a flat-out waste of judicial resources. Once plaintiff and third party defendants had filed a motion for summary judgment on defendants' affirmative defenses and counterclaims related to breach of contract, they had no reason to file almost identical motions to dismiss the same claims, rehashing the same arguments (often verbatim). Although plaintiff and third party defendants' new round of motions to dismiss came in response to newly filed counterclaims from defendants, these new counterclaims were merely responses to plaintiff's third amended complaint, for which leave was granted only to reflect defendants' changing corporate structure. Dkt. #211. Plaintiff's third amended complaint did not open the door for plaintiff and third party defendants to file a new round of motions to dismiss. Therefore, the arguments raised in plaintiff and third party defendants' motions to dismiss will be disregarded and the motions denied. As I noted, many of the same arguments are raised in support of plaintiff and third party defendants' motion for summary judgment. However, to the extent plaintiff and third party defendants failed to consolidate their arguments within their briefing for summary judgment, they have forfeited those issues.

6

B.  Third Party Defendant Erich Spangenberg's Motion to Dismiss for Lack of Personal

Jurisdiction (dkt. #280)

Third party defendant Erich Spangenberg's motion to dismiss for lack of personal jurisdiction is yet another motion that comes too late.  Third party defendant Spangenberg joined the last round of motions to dismiss for lack of personal jurisdiction.  These motions were briefed, evidence was submitted by both sides and the motions were ruled on in October.  On the basis of defendants' allegations and supplemental evidence, I concluded that this court could exercise personal jurisdiction over third party defendants, including Spangenberg.  Dkt. #212 at 20-23.  Spangenberg provides no persuasive reasons for reexamining the issue of personal jurisdiction.  This motion will be denied.


C.  Defendants' Motion to Supplement Counterclaims, Motion to Strike and Related

Motions (dkt. ##201, 359, 370, 381)

Defendants have moved for leave to supplement their counterclaims to include allegations of additional breaches of contract by plaintiff and third party defendants based on their filing of additional lawsuits elsewhere.  However, as defendants concede, these lawsuits allege infringement of patents distinct from the '658 patent and in one occasion involve a separate entity, ST Sales, which defendants assert is another Spangenberg alter ego.

The court has broad discretion to grant or deny motions to supplement under Fed.

7

R. Civ. P. 15(d).  To allow defendants to supplement their counterclaims at this late date is likely to be prejudicial to plaintiff and third party defendants and cause undue delay. Moreover, defendants have given the court no reason to think they could not or have not asserted breach of contract counterclaim in the context of those separate lawsuits.  Therefore, defendants' motion for leave to supplement their counterclaims in this case to allege additional contract breaches will be denied.

Next, defendants have moved to strike certain statements made in plaintiff and third party defendants' response to defendants' proposed findings of facts and in plaintiff and third party defendants' reply brief in support of their motion for summary judgment.  Most of the statements to be stricken relate to facts and arguments concerning ST Sales.  Dft.'s Mot., dkt. #359 at ¶¶ 1-3, 6-8.  Because defendants will be denied leave to supplement their counterclaims, the parties' disputes about ST Sales are moot.  The remaining statements to be stricken, ¶¶ 4-5 and 9, relate to facts plaintiff proposes in response to defendants' facts that do not directly put into dispute defendants' facts, but rather seek to supplement them. See Plt.'s Resp. to PFOF, Dkt. #340, ¶¶ 72, 81.  As the movant, plaintiff was instructed that it was to "include ALL factual propositions [it] consider[ed] necessary for judgment in [its] favor" in its initial proposed findings of facts and was not allowed a second round for submitting additional facts, but only an opportunity to dispute any facts proposed by defendant when plaintiff filed its reply.  Procedure to be Followed on Motions for Summary

8

Judgment, I.B.3, III, attached to Preliminary Pretrial Conference Order, dkt. #39.  A movant's response to the nonmovant's additional proposed findings of fact is not an opportunity to include facts previously overlooked.  Because plaintiff's responses to defendants' facts ¶¶ 72 and 81 failed to put into dispute the facts proposed and simply added facts, the responses will be disregarded, pursuant to this court's procedures.  Therefore, defendants' motion to strike will be denied as unnecessary.  Moreover, defendants' motion to file a reply brief will be denied as moot.

The last related "motion" is plaintiff's attempt to move for sanctions, found in its opposition brief to defendants' motion to strike.  The court will disregard this "motion."  If plaintiff wanted to move for sanctions in relation to defendants' motion to strike, it should have done so by filing a motion, not by making comments in a brief.

### D.  Plaintiff's Motion to File a Surreply (dkt. #203)

Finally, plaintiff has moved to file a surreply to defendants' motion for summary judgment.  Plaintiff provides no justification for doing so and its proposed surreply contains nothing new.  Plaintiff's motion will be denied.

### E.  Remaining Motions (dkt. ##156, 235, 286)

Three motions remain for consideration: cross motions for summary judgment on

9

defendants' claims of breach of contract and affirmative defenses that the patent is licensed and released (dkt. ## 156, 235) and defendants' motion for summary judgment on plaintiff's infringement claims (dkt. #286). Because the license and release provisions found in the settlement agreement between Orion IP and defendants do not cover the '658 patent, defendants' motion for summary judgment on the ground that the claims are released and licensed will be denied and plaintiff and third party defendant's motion for summary judgment will be granted in part. However, plaintiff and third party defendants' motion for summary judgment will be denied in part because triable issues of fact remain regarding whether plaintiff and third party defendants are liable for the breach of a warranty provision found in the settlement agreement. Finally, defendants' motion for summary judgment on plaintiff's infringement claims will be granted because plaintiff has failed to establish that defendants' products infringe the asserted claims in the '658 patent by allowing web surfers to configure vehicles and compare them to dealer inventory or save them to a personal profile. Moreover, defendants' motion for summary judgment on its claim that the asserted claims of the '658 patent will be granted in part because claims 16 and 27 are invalid as anticipated by United States Patent No. 5,825,651 (the '651 patent) and denied in part because defendants have failed to establish by clear and convincing evidence that claims 19, 22 and 23 are invalid as anticipated by the prior art.

Before turning to the facts, I note that both sides' proposed findings of fact are

10

deficient.  Consistently throughout the proposed findings of fact for the remaining motions before the court, the parties combined legal conclusions ("Mr. Spangenberg has directly or indirectly controlled Caelum and Constellation because:") with facts ("(a) Before its merger with Constellation, Mr. Spangenberg was Caelum's sole member."). Dft.'s PFOF, dkt. #158, ¶ 34.  This left it up to the court to untangle the two.  This was especially difficult for the facts proposed related to patent infringement, where the parties filled their product descriptions with claim terms or claim construction terms (e.g. "A *user* who visits Chrysler websites can also *specify* another *rule* by selecting a configured vehicle model type . . . and applying another comparison *rule* by searching the inventory of each local dealer."). Plt.'s PFOF, dkt. #318, ¶ 171 (emphasis added).  Moreover, the opposing party's responses to such legal conclusions were often disputes about the legal conclusions, filled with divergent facts, turning each proposed finding of fact into a "mini-brief."  E.g., Plt.'s Resp. PFOF, dkt. #318, ¶ 28 (in response to a characterization of plaintiff's position, plaintiff submitted nearly six pages of expert testimony.)  This lack of discrimination between fact and law slowed the fact-finding process.  Finally, as I explained above, plaintiff and third party defendants attempted to propose additional facts as "responses" to defendants' proposed findings of facts and relied on these facts in their reply brief in support of their motion for summary judgment.  I have disregarded any facts first proposed with a reply brief.

I find the following facts to be material and undisputed.  (Although the citizenship

11

of the parties is usually irrelevant in a patent case, in this case it bears on certain questions, such as what state laws apply to the associated contract claims.  In addition, setting out the facts of citizenship helps identify the many and varied entities.)

UNDISPUTED FACTS

A.  <u>Parties</u>

Defendant Daimler Chrysler Corporation was a corporation organized and existing under the laws of Delaware, with its principal place of business in Michigan.  On March 31, 2007, defendant DaimlerChrysler Corporation was converted into a Delaware limited liability company, known as defendant DaimlerChrysler Company, LLC.  On July 30, 2007, defendant DaimlerChrysler Company, LLC changed its name to Chrysler, LLC.  (For the purpose of the motions before the court, these three entities may be treated as one. Therefore, I will refer to these three parties collectively as defendant Chrysler.)

Defendant Mercedez-Benz USA, LLC is a limited liability company with its principal place of business in New Jersey.

Defendant Chrysler Holding, LLC is a limited liability company organized under the laws of the state of Delaware.

Defendant DaimlerChrysler Financial Services Americas, LLC is a limited liability company that does business under the name "Chrysler Financial."

12

Plaintiff Taurus IP, LLC is a Wisconsin limited liability company, with its principal place of business in Wisconsin.

Third party defendant Plutus IP Wisconsin, LLC is a limited liability company organized under the laws of Wisconsin with its principal place of business in Wisconsin.

Third party defendant Orion IP, LLC is a Texas limited liability company with its principal place of business in Texas.  It is the successor entity to a Delaware limited liability company also named Orion IP, LLC.  The two Orion entities merged on March 30, 2006. (For the purpose of the motions before the court, these two entities may be treated as one. Therefore, I will refer to these two entities as defendant Orion IP.)  Orion IP was the plaintiff in an earlier set of lawsuits against defendants and was a party to a licensing agreement reached as a result of those lawsuits.

Third party defendant Erich Spangenberg is a resident of the state of Texas.

## B.  The Texas Lawsuits

### 1.  Nature of the lawsuits

On February 22, 2004, Orion IP acquired the rights to fourteen patents from a company named Firepond.  These included United States Patent Nos. 5,615,342 (the '342 patent), 5,367,627 (the '627 patent) and 6,141,658 (the '658 patent).  Orion IP's acquisition was recorded in the public files of the United States Patent and Trademark

13

Office on March 8, 2004.

The invention disclosed in the '342 patent, entitled "Electronic proposal preparation system," disclosed an electronic system for creating customized product proposals. The invention disclosed in the '627 patent, entitled "Computer-assisted parts sales method," disclosed a computerized system that provided a salesperson with assistance related to training and sales of parts. The invention disclosed in the '658 patent, entitled "Computer system and method for managing sales information," disclosed a computer system used for managing product knowledge related to products offered for sale.

On August 25, 2004, Orion IP filed suit against defendant Chrysler in the United States District Court for the Eastern District of Texas, alleging that defendant Chrysler's websites www.chrysler.com, www.dodge.com and www.jeep.com and its systems implemented programs that infringed the '342 and '627 patents. The accused websites relate to computer-assisted activities for marketing and providing information about defendant Chrysler's products.

Approximately one year later, Orion IP filed suit against defendant Mercedes-Benz USA, also in the Eastern District of Texas, alleging that defendant Mercedes-Benz USA's website www.mbusa.com and internal systems implemented programs that infringed the '342 and '627 patent.

During the Texas lawsuits, Orion IP served a document on defendants called "Patent

14

Infringement Contentions" that includes links to features on defendant Chrysler's websites called "Build and Price."  In its response to an interrogatory in the current suit, plaintiff lists website addresses accused of infringement, some of which contain links to the same "Build and Price" feature accused in the Texas lawsuits.  In addition, plaintiff lists website addresses that implement a feature on www.mbusa.com called "Build Your Own," which is a car configurator feature identical to certain features found in the websites Orion IP accused defendant Chrysler of infringing in the Texas lawsuits.

Orion IP owned the '658 patent when it filed a lawsuit against defendant Chrysler, but did not accuse defendant Chrysler of infringing the '658 patent at that time.


## 2.  Settlement negotiations

Orion IP has never marketed or sold products.  During the course of the Texas lawsuits, defendant Chrysler learned that Orion IP's business was to license patents through litigation and that it had asserted patents in numerous other lawsuits in the Eastern District of Texas.

On February 14, 2005, third party defendant Spangenberg, David Pridham, counsel for Orion IP, and Judge Robert Parker met with defendant Chrysler's attorneys to discuss settlement of the Texas lawsuits.  (The parties dispute what occurred at this meeting. Plaintiff contends that Spangenberg and Pridham described two types of licenses, a broad

"portfolio" license and a narrower "patent-in-suit" license, noted that Orion had entered into both types of agreements in the past and offered both types of licenses to defendant Chrysler.  Defendant Chrysler contends that Spangenberg and Pridham made a money demand of $11 million and did not discuss any non-price terms in detail.)

Throughout the negotiations that occurred in February 2005 and again during the last week of January 2006 and the first two weeks of February 2006, defendant Chrysler refused to pay the amount that Orion IP demanded.  By February, 2006, defendant Chrysler learned that some of the defendants in other lawsuits brought by Orion IP were entering into settlements with Orion IP, and it began considering settlement for itself.  By that time, defendant Chrysler had received copies of Orion IP's settlement agreements with Hitachi, Fuji, Keystone and Ford.  Orion's agreement with Keystone specifically licensed the '658 patent.

On February 9, 2006, defendant Chrysler engaged in settlement negotiations by phone with Orion IP.  Defendant Chrysler's representatives requested a draft agreement from Orion IP's representatives.  Pridham, Orion IP's counsel, emailed defendant Chrysler a redacted copy of Orion IP's settlement agreement with Ford Motor Company.  Counsel for defendant Chrysler told Orion's representatives that they could persuade management to agree to settle with Orion only if they could state that they received the same deal as Ford for less money.

16

Pridham represented that the agreement "covered everything that [defendant Chrysler] was looking for."  Representatives for defendant Chrysler asked Pridham and Spangenberg, "Now, this covers everything in your portfolio . . . this is everything you have, correct?"  Pridham's and Spangenberg's response was, "Yes, it is."  At the end of the call, Orion IP sent a draft agreement based on the Ford settlement agreement they had discussed.

On Monday, February 13, 2006, defendant Chrysler sent Orion IP a redline settlement agreement that proposed to amend the license in Section 3.1 to make it specific that it would include activities related to "the sale of DCC [defendant Chrysler] or DCC Related Company product."  In addition, defendant Chrysler sought to add an additional patent of Orion IP's to the list of protected patents, United States Patent No. 6,453,302 (the '302 patent), to protect activities that defendant Mercedes-Benz planned to conduct on its website.  Spangenberg accepted the changes in the redline draft without requiring any additional consideration for the addition of the '302 patent.  The parties executed the agreement, entitled "Patent License and Settlement Agreement," on Wednesday, February 15, 2006.

Third party defendant Spangenberg never represented on behalf of Orion IP that defendant Chrysler was receiving a license that would cover all patents owned by all Orion companies.  Spangenberg is not aware of any other representative of Orion who represented that defendant Chrysler would receive as much.  However, at some point during settlement

17

negotiations, a representative of defendant Chrysler stated to Pridham and Spangenberg, "When we settle with you, we're done with you.  We don't ever hear from you again." Spangenberg and Pridham said, "That's fine."

Orion IP never concealed the fact that the companies that would be considered "Orion Related Companies" had other patents or that its initial acquisition of patents had been broken into groups of patents and assigned to different corporations.  In addition, Orion never concealed its assignment of the '658 patent to Caelum IP on August 30, 2004; the assignment was publicly filed on August 31, 2004 and Orion IP produced documents during the Texas litigation showing Orion IP's former ownership and assignment of interest of the '658 patent.  At the same time, Orion IP never specified to defendants which companies were Orion Related Companies or what assets those companies owned.

3.  <u>Patent license and settlement agreement</u>

Under the parties' agreement in the Texas lawsuits, defendant DaimlerChrysler agreed to pay $2.3 million to Orion IP in return for settlement of the lawsuit, release of infringement liability and patent licensing.  The agreement licenses defendants to use their allegedly infringing technology in certain ways:

> 3.1 <u>Orion License to DCC</u>.  Subject to the payment provided under Article V and the terms and conditions of this Agreement, Orion hereby grants to DCC and the DCC Related Companies a non-exclusive, non-transferable (except as

18

provided for in Article VII), royalty-free, fully paid-up, worldwide license, without the right to sublicense, under the Orion Patents to practice, design, make, have made, operate, have operated, import and use the Licensed Technology in the Field . . .

In addition, the Agreement releases defendants from liability for certain uses of their

technology:

2.1 <u>Orion Release of DCC</u>.  Orion, on behalf of itself and the Orion Related Companies and their respective successors and assigns, irrevocably releases, acquits and forever discharges DCC and the DCC Related Companies and their respective officers, directors, employees, agents, successors, assigns, representatives, and attorneys, and its and their respective customers and users, suppliers, and vendors, solely with respect to activities that would have been licensed under this Agreement if they had been performed on or after the Effective Date, in each case from any and all claims or liabilities of any kind and nature, at law, in equity, or otherwise, known and unknown, suspected and unsuspected, disclosed and undisclosed, relating in any way to the Litigation or the Orion Patents.

However, the agreement sets explicit limitations to the rights or licenses it grants:

3.5 <u>No Other Rights</u>.  No rights or licenses are granted under any Patents except as expressly provided herein, whether by implication, estoppel or otherwise.  Without limiting the foregoing sentence, . . . (ii) no release or license is granted by either party, or any of its Related Companies, either directly or by implication, estoppel, or otherwise, to any Third Party for the combination of the Licensed Technology with any other items that are not Licensed Technology or for the use of such combination, except as necessary for the normal and intended use of the Licensed Technology themselves. . . .

Several key terms are defined in the agreement:

"<u>DCC Related Company</u>" means any Person, on or after the Effective Date directly or indirectly controlling, controlled by or under common control with DCC . . . . For purposes of this definition, DCC Related Companies shall

19

include, by way of example but not limitation, Mercedes-Benz USA LLC.

"Licensed Technology" means all methods, processes, apparatuses, devices, products, web sites, systems and other inventions falling within the scope of one or more claims of the Orion patents.

"Orion Related Company" means any Person on or after the Effective Date directly or indirectly controlling, controlled by or under common control with Orion, whether through the ownership of securities, as a result of contract or otherwise, it being understood that the ownership of securities or other instruments representing fifty percent (50%) or more of the outstanding voting power of a particular Person shall conclusively constitute control for purposes of this definition.

"Orion Patents" means only (I) those Patents listed in **Exhibit A** to this Agreement [U.S. Patent Nos. 5,283,865; 5,367,627; 5,493,490; 5,615,342; 5,625,776 and 6,453,302 and U.S. Patent Application Serial No. 09/556,029], (ii) any and all Patents existing or subsequently issuing from applications from which the listed Patents claim priority, (iii) any and all Patents existing or subsequently issuing from continuations, divisionals, continuations-in-part, reexaminations, reissues, extensions, and renewals of any listed Patents, (iv) any foreign counterparts of any of the foregoing in any jurisdiction of the world, and (v) any patents acquired by Orion after the Effective Date providing for or related to the cataloguing, configuration and sales of parts and vehicles.

"Person" means an individual, trust, corporation, partnership, joint venture, limited liability company, association, unincorporated organization or other legal or governmental entity

"Third Party" means a Person other than a party to this Agreement or a Related Company of a party to this Agreement.

According to a choice of law provision, the "Agreement and matters connected with the performance thereof" shall be "governed in all respects" by United States and Texas law

"without reference to conflict of laws principles."

In the agreement, Orion made certain representations and warranties regarding the assignment or transfer of rights before settlement:

8.1 <u>Representations and Warranties</u>.  (a) Orion represents and warrants as of the Effective Date that . . . (iii) it has not assigned or otherwise transferred to any other Person any rights to any causes of action, damages or other remedies, or any Orion Patents, claims, counterclaims or defenses, relating to the Litigation.

In addition, a "merger clause" in the agreement limits the parties' reliance on previous oral promises:

8.9 <u>Entire Agreement</u>.  This Agreement embodies the entire understanding of the parties with respect to the subject matter hereof, and merges all prior discussions between them, and neither of the parties shall be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein. No oral explanation or oral information by either party hereto shall alter the meaning or interpretation of this Agreement.

## C.  Spangenberg and the Orion Companies

1. <u>Spangenberg's role in transferring the '658 patent</u>

On August 30, 2004, Orion IP assigned its rights in the '658 patent to an entity called Caelum IP, LLC.  As Caelum's manager, Spangenberg executed the assignment of the '658 patent to Caelum five days after Orion IP filed a lawsuit against defendant Chrysler.

On February 6, 2006, three days before the parties engaged in serious settlement

21

negotiations and nine days before the parties executed the settlement agreement, Caelum IP, LLC merged with Constellation IP, LLC, a Texas limited liability company with its sole place of business in Texas. The '658 patent was assigned to Constellation IP as the surviving entity of the merger. At the time of the merger, Spangenberg was Caelum IP's sole member. Spangenberg is Constellation IP's manager, and to the extent that Caelum IP continues to exist, Spangenberg is the manager of that entity. The assignment of the '658 patent from Caelum IP to Constellation IP was not recorded until February 14, 2006.

Third party defendant Spangenberg did not read the '658 patent in its entirety until February 2007 at the earliest and "spent no time" with the patent before then. In 2007, counsel for one of the corporate entities owned or managed by Spangenberg raised the issue that defendants' websites might infringe the '658 patent.

Plaintiff was formed on March 5, 2007. Five days after its formation, Constellation IP assigned its rights in the '658 patent to Taurus IP, LLC, a Texas limited liability company with its sole place of business in Texas. Shortly thereafter, Texas Taurus IP merged with plaintiff. Spangenberg executed the assignment documents to plaintiff.

Plaintiff is in the business of licensing the '658 patent. The assets and source of projected revenue for plaintiff are licensing fees it hopes to receive from licensing the '658 patent. On March 20, 2007, plaintiff filed this lawsuit against defendants Chrysler and Mercedes-Benz, alleging that their websites and systems infringe the '658 patent.

22

2.  Spangenberg's role in the Orion companies

Spangenberg has been the manager of Orion IP since its formation in 2004.  For the merger between Delaware Orion IP, LLC and Texas Orion IP, LLC, he executed merger documents as sole member and manager.

Spangenberg authorized Orion IP to file the Texas lawsuits against defendants Chrysler and Mercedes-Benz.  At the time of settlement, a company called Plutus IP, LLC owned at least 50% of Orion IP.  A company called Acclaim Financial Group controlled Plutus.

Spangenberg is the manager of third party defendant Plutus IP Wisconsin, LLC, which is plaintiff's sole owner and managing member.  Acclaim Financial Group owns third party defendant Plutus IP Wisconsin.

Spangenberg is plaintiff's primary book and record keeper.  He authorized plaintiff's formation documents, its lease agreements in Wisconsin, the money used to capitalize plaintiff, its decision to seek licensing fees from the '658 patent and its decision to bring the current lawsuit against defendants.  In addition, it was Spangenberg who verified plaintiff's responses to interrogatories in this lawsuit.

Spangenberg is the only natural person who has made business decisions for plaintiff and Orion IP.  In his role as manager for Orion, Spangenberg had the authority to file lawsuits on behalf of Orion and did not have to obtain any authority from any other person

23

to file lawsuits or enter into settlement agreements.  Spangenberg authorized the merger of plaintiff, authorizes cash advances that are made to plaintiff and authorized plaintiff to bring the three lawsuits it has brought in this court.

3.  Corporate structure of Orion companies

Both Orion and plaintiff are owned ultimately by Plutus IP, LLC, which is owned by Acclaim Financial Group.  Spangenberg is the manager of Plutus IP, LLC, Orion and plaintiff.  Orion and plaintiff have no employees.  Orion shares a common business address in Texas with several Orion related companies.  Both Orion and plaintiff were capitalized by Plutus IP.  Plutus IP's audited financial statement includes the property of all Orion related companies, including Orion and plaintiff, and does not distinguish among the property, assets and liabilities of each Orion related company.  Money is exchanged freely among Acclaim Financial Group, LLC, Plutus IP, LLC and the Orion related companies.  Spangenberg requests funds from Plutus IP for the respective Orion related companies in his role as manager of each company.  Acclaim Financial Group pays federal taxes for all of the Plutus subsidiaries, including Orion and plaintiff.

D.  The '658 Patent

Plaintiff owns United States Patent No. 6,141,658 (the '658 patent), entitled

24

"Computer System and Method for Managing Sales Information."

1.  Date of the invention

The application for the '658 patent was filed on September 10, 1997; the patent issued on October 31, 2000.  Neither inventor recalls when the invention of the subject matter of the '658 patent was conceived.  A data model for the '658 patent, attached as Appendix A to the patent, contains a file creation date of June 10, 1996 and a last modified date of December 11, 1996.  Appendix A is 100 pages long and each page has a December 11, 1996 date stamped on the bottom.  One of the inventors, Jerome Johnson, did not know when Appendix A had been completed.

2.  Asserted claims

Claim 16 of the '658 patent is independent and discloses:

16.    A computer system implemented method for managing product knowledge comprising a plurality of data items related to products offered for sale by a selling entity, the computer system including a memory arrangement and at least one processing unit, the method comprising:
[1] defining a data model of data categories, the data model establishing relationships between data categories;
[2] receiving in the computer system one or more particular data items corresponding to one or more of the data categories;
[3] receiving user-defined relationship information for the particular data item, the relationship information relating the particular data item to one or more other data items; and

25

[4] presenting the product knowledge, including information about the particular data item, to a user of the system in a manner established by the data model and the user-defined relationship;
[5] wherein the data model is constructed from one or more data instance items interconnected using the user-defined relationship items for each data instance item.

(The numbers in brackets represent the steps of claim 16, a method claim. The parties agree that the brackets represent the separate steps of the claim.)

Claims 19, 22 and 27 depend from claim 16 and disclose:

19. A method, according to claim 16, further comprising creating data objects representing the data categories.

22. A method, according to claim 16, further comprising selecting a portion of the product knowledge for presentation to the user.

27. A method, according to claim 16, further comprising using a graphic user interface configured and arranged to facilitate creating the user-defined relationship item.

Claim 23 depends from claim 22 and discloses:

23. A method, according to claim 22, further comprising selecting the portion of the product knowledge in a manner established by the data model and the user-defined relationship.

3. The court's construction of claim terms

In an order dated November 9, 2007, I construed numerous claim terms included in the '658 patent. Dkt. #242. In the context of the '658 patent, I concluded that the

26

following terms have the following meanings:

- "Data items" means "items of information related to products offered for sale by a selling entity."

- "User-defined relationship information" means "the set of rules specified by the user that governs the relationship between data items within the data model."

- "User" means "a person who is capable of creating and editing user-defined relationship information."

- "Data instance items" means "a group of one or more data items and one or more user-defined relationship items."

- "User-defined relationship items" means "individual rules specified by the user that belong to and interconnect data instance items."

4. Accused products and their operation

a. Chrysler products and their operation

Defendant Chrysler' external websites www.chrysler.com, www.dodge.com and www.jeep.com implement features called "Build Your Own" and "Search New Inventory." Plaintiff has identified approximately 45 website addresses related to these external websites.

The accused Chrysler websites contain information related to the features, specifications, certain options, related services and availability of the vehicles offered for sale in dealers' inventories. The websites use a computer system that includes a memory

arrangement to provide that information and consists of at least one web or database server controlled by defendant Chrysler or its agents that supports and enables the accused functionalities.

Defendants implement their systems using Java object-oriented programming language to construct a data model comprising classes and objects. In the java programming language, objects arise from classes. Defendants' data model includes classes such as UserContextImpl with information related to web surfers; ConfigContext, with information related to vehicles configured by a web surfer; and DealerContext, with information related to dealer inventory. ConfigContext, DealerContext and LeadContext are included elements of the class UserContextImpl.

Defendant Chrysler's servers transmit web pages to a web surfer. On the web pages, a web surfer may select from predefined options for a vehicle's model, exterior and interior paint color, interior options, engine sizes and dealer, or select from predefined options packages. Defendant Chrysler's servers receive information based on the web surfer's choices that corresponds with classes in its data model.

The web surfer's configured vehicle and the vehicles in dealers' inventory are represented as objects in the source code. Defendants' system receives information from a web surfer that is related to the ConfigContext object and the LeadContext object. Both of these objects are contained as elements of the UserContextImpl object. A web surfer is

28

allowed to search for dealers within a specified area by entering a ZIP code, search radius and desired dealer services. The website presents a hierarchy of information showing a list of dealers within the area specified and each dealer's respective inventory. To do this, the system compares each dealer's location, drawn from an object containing dealer inventory information, with the ZIP code and radius specified by the web surfer, drawn from an object containing information provided by the web surfer.

In addition, a web surfer may compare a configured vehicle to vehicles in the dealers' inventories. The accused system matches the web surfer's criteria in terms of vehicle types and distance and presents a list of matching dealer inventory for each dealer that can be ordered according to the closeness of the match to the web surfer's configured vehicle.

A web surfer may change the results presented by entering a different ZIP code, radius or configured vehicle. However, the "comparison" operator used to compare configured vehicles to dealer inventory and the "Radius Searcher" feature used to search for dealers within a given radius are invariant logical operations. In other words, the relationship among a given ZIP code, search radius, configured vehicle and dealers is predetermined by Chrysler, and the web surfer chooses only the variables to apply to those operations. Moreover, the web surfer does not establish any rules about whether particular car features, paint colors or option packages are available on a given Chrysler model. For example, if defendant Chrysler has not made All-Wheel Drive available on a given model, the web surfer

29

cannot select that option for that model.

b.  Mercedes-Benz products and their operation

Defendant Mercedes-Benz USA's external website www.mbusa.com implements features called "Your Portfolio," "My Saved Vehicles" and "Build Your Own."  Plaintiff has identified approximately 36 website addresses related to this external website.

The accused Mercedes-Benz USA websites contain information related to the features, specifications, certain options, related services and availability of the vehicles offered for sale in dealers' inventories.  The websites use a computer system that includes a memory arrangement to provide that information and consists of at least one web or database server controlled by defendant Mercedes-Benz USA or its agents that supports and enables the accused functionalities.

Defendants implement their accused systems using Java object-oriented programming language to construct a data model of classes and objects.  Defendants' data model includes classes such as Car, with information related to vehicles, and MBUser, with information related to web surfers.  SaveCarBean.java saves vehicles related to a web surfer by member key, a unique "user ID."

Defendant Mercedes-Benz USA's servers transmit web pages to a web surfer.  On the web pages, a web surfer may select from predefined options for a vehicle's interior color,

30

packages or accessories.  In addition, a web surfer may input a unique "user ID."  Defendant Mercedes-Benz USA's servers receive information based on the web surfer's choices that corresponds with certain classes in its data model.  The accused system receives choices made by a web surfer such as color and email address and enters that information in objects representing a web surfer's profile ("My Profile") and saved configured vehicles ("My Saved Vehicles").  The web surfer's "My Profile" contains personal information as well as a list of vehicle types the web surfer may select to receive additional information.

A web surfer may configure a vehicle and add it to the web surfer's profile information.  When this is done, an underlying data object representing the configured vehicle is connected to an object representing the web surfer's My Profile by the logical operator AND.  Saved configured vehicles are displayed in a hierarchical manner.

A web surfer may create new configured vehicles, add or remove multiple configured vehicles and view their configured vehicles saved in the "My Saved Vehicles" portion of their "Your Portfolio."  A web surfer cannot decide whether a price or power should be related to a particular vehicle or how the available options should be related.

## E.  The '651 Trilogy Patent

### 1.  Date of the invention

United States Patent No. 5,825,651 was filed on September 3, 1996 by inventors

employed by Trilogy Development Group, Inc. and was assigned to Trilogy.  It issued on October 20, 1998.

2.  Disclosure of the '651 patent

The '651 patent is entitled "Method and Apparatus for Maintaining and Configuring Systems."  "Examples of systems that can be maintained or configured using the system include automobiles, computers, time clock machines, and shoes."  '651 pat., col. 5, lns. 44-46.

Figure 1 of the specification for the '651 patent depicts a main memory, video memory and a central processing unit.

The abstract to the '651 patent explains that "the invention provides a framework for defining a systems [sic] by defining the components of the system using elements contained in a parts catalog and defining relationships between the components of a system." '651 pat., abstract.  The specification summarizes the way relationships are to be defined:

> Relationships can be defined between parts in a products definition. A relationship relates a first set of parts with a second set of parts.  A set can include multiple parts.  The incorporation of parts in a set can be arbitrary. That is, a multi-part set can contain parts that are otherwise unrelated.  For example, a set can contain parts such as an engine, sun roof and a color. These parts seem to be unrelated, however, it is possible to combine them into a relationship set for purposes of forming a relationship using the present invention.
> Preferably, the part relationships are: included, excluded, removed, and

32

requires choice.  An included part is included automatically.  A part is excluded from the configuration when its inclusion would result in an invalid configuration.  A part may be removed when another part is added.  Thus, when a first part exists in the configuration and a second part is added, the first part is removed from the configuration.  The requires choice relationship is used to allow a set of choices to be made from a group of parts.  The number of parts chosen is limited to a valid bounds specification.  The relations that are created between parts within a product are enforced only on that particular product.  However, if some part-to-part relationships are to be enforced on all products within a product line, then the relations are generated once and enforced for all products.

'651 pat., col. 2, lns. 12-21.

The part relationships disclosed in the '651 patent are illustrated in  Figure 4:



The dashed line box in Figure 4 is further described in the specification: "Parts 408 and 410 can be combined to form group 416.  Group 416 can be defined by the user.  If the user does not define group 416, the invention preferably creates group 416 to contain parts 408 and 410."  '651 pat., col. 6, lns. 60-63.

Figure 2 of the '651 specification discloses the relationship between a maintenance and configuration systems of the patent:



The specification describes Figure 2 as follows:

Maintenance system 202 maintains a parts catalog 204, parts relationships 206 and product definitions 208.  Maintenance system 202 uses a user interface that includes the ability to add items to parts catalog 204 and specify part relationships 206 and product definitions 208.  The user interface displays a set of hierarchies that provide a conceptually easier way of viewing a definition.  The invention maps the set of hierarchies (an external representation) to an internal representation.
 . . .
Parts catalog 204 consists of parts that are components of products.  Similar parts are grouped together to form a part hierarchy . . . . [W]hen a group of parts is assigned a behavior, all the members inherit that behavior

34

> automatically . . . . A group can contain other groups.  For example, group 314
> contains group 312 and parts 316-318.  Behavior assigned to elements of
> group 314 is inherited by members of group 312.

'651 pat., col 5, lns. 54-62, col. 6, lns. 7-20.

The relationships created by the invention disclosed in the '651 patent are

represented by tables explained in the summary of the invention:

> Tables contain element relationships.  A table is used to represent the
> includes, excludes, removes, and requires choice relationships, for example.
> Each table has a left-hand side and a right-hand side that corresponds to the
> left-hand and right-hand sides of a relationship.  In each case, the left-hand
> side is a bit vector that contains bits that correspond to elements.  The
> includes, excludes and removes tables contain a bit vector in the right-hand
> side that represents configuration elements.  The right-hand side of the
> requires choice table is a pointer that points to an entry in a group table.  The
> group table entry is a bit vector that identifies the elements that are contained
> in the group from which a choice is to be made.  The right-hand side of a
> requires choice table entry further includes minimum and maximum
> designations.  Minimum and maximum values identify the minimum and
> maximum number of group members that are to be selected and satisfy a
> requires group relationship.

'651 pat., col. 3, lns. 28-45.

Figure 6, portrayed on the face of the patent, discloses a Graphic User Interface representation of the relationships between the parts and groups of parts:



FIG. 6

As the specification explains,

> The GUI screen of FIG. 6 illustrates a view of a product as seen by a user (e.g. maintainer and configuration user). A view of the product that is seen by a user is referred to as the external representation. A user sees a product or product definition from a conceptual level that is easy to understand. The user does not need to express a definition or configuration using a language that has a syntax that is foreign to the user. A GUI having graphical selections and operations is preferably used to allow the user to see the external representation. The external representation uses terminology that is familiar or intuitive to the maintainer. For example, an include product relationship defines elements that can be included in a product.

'651 pat., col. 8 ln. 64 - col. 9, ln. 9.

36

The specification describes in detail the user's role in using the Graphic User Interface

found in Figure 6:

> A user can drag elements from pane 602 to panes 604-608 to define a product. For example, to include Part B in the product definition, Part B is dragged from pane 602 to pane 604. Alternatively, to drag parts B, C, D, and E, group A can be dragged from pane 602 to pane 604. Group A and its component parts (parts B, C, D, and E) are thereby included in the product definition.

'651 pat. col. 8, lns. 12-18. In addition, the summary of the invention includes a description

of the role of the user and the relationship between external and internal representations:

> [t]he external representation uses a conceptually understandable set of relationships for defining a system and the relationships between the components of the system. The invention takes the definition created by a user and supplements and compresses the definition when necessary to create an internal representation. The internal representation is used during configuration to initialize and validate a configuration based on user input.

'651 pat., col. 3, lns. 4-11.

## F. SC Config and Marketing Configurator

At some time before November 1995, Trilogy Development Group, Inc. developed

an application called Marketing Configurator. At the end of November 1995, Trilogy

offered Marketing Configurator for sale to a company called ThermoKing, although it is not

clear under what conditions. Trilogy made the first sale of Marketing Configurator to a

company now called Custom Foot on November 15, 1996, about two months after it filed

the application for the '651 patent.  The Master License Agreement for that sale warned Custom Foot that "The Software and other related materials furnished by Trilogy contain valuable and confidential information which is proprietary to Trilogy and constitute trade secrets and the unpublished copyrighted material of Trilogy."  In addition, Custom Foot was bound by the agreement to "take every reasonable precaution to prevent the theft, disclosure, and the unauthorized copying, reproduction or distribution or use thereof" and was bound "not [to] reverse engineer the Software, or disassemble, decompile, or apply any procedure or process to the Software in order to ascertain, derive, and/or appropriate for any reason or purpose, the source code."

A later version of the application was named SC Config.  It contained the same "basic functionalities" as Marketing Configurator.  The '651 Trilogy patent patented at least certain aspects of the SC Config system.  As early as November 1995, Trilogy offered SC Config for sale to defendant Chrysler.  In 1996, Trilogy presented a demo of SC Config to defendant Chrysler.  It is not clear whether the demo was provided to defendant Chrysler in confidence, but it was produced in this lawsuit as "Confidential," suggesting it was not intended for public disclosure.

Prior to summer 1996, defendant Chrysler made a first run of a website based on the SC Config Technology.  The features of SC Config are described in a 1996 User Guide and Reference.  The user guide states on the cover that "This material is unpublished and

38

Confidential Information of Trilogy Development Group and is available under license only. This material is not to be copied or disclosed without the prior written approval of Trilogy Development Group."

Both SC Config and Marketing Configurator contained a maintenance module, called "Claire," that allowed an individual to enter new parts for the product to be configured by creating parts and constraints and relationships for the different parts. In addition, both applications contained a configuration module, called "Bob," that used the part information to configure finished and properly assembled products based on parts and relationships established in Claire. With Bob, a user could make a selection from available parts and Bob would search for relationships between parts to make available those options determined in Claire.

Tables for either Marketing Configurator, SC Config, or both, demonstrate the coding and storage of parts and part relationships in that application. These tables were not disclosed and were kept a trade secret by Trilogy.

### G. VISTA

In the early 1990's, defendant Mercedes-Benz USA replaced its MBNet intranet with a collection of programs eventually released as VISTA on April 10, 1995. VISTA was released to pilot dealers about three months before that date. (The parties dispute whether

39

the pilot dealers were bound by obligations of secrecy and non-disclosure.)

A feature called "Vehicle Locator" was present in the VISTA system released to pilot dealerships. A Locate Vehicle module was used to locate a configured vehicle in inventory in a particular region, particular dealership or even a configured vehicle on order. Once the car was configured, the user could search the inventories of dealerships in specific cities for a particular configured car. It could be used in person with a customer or it could be used by a salesperson with a customer on the phone.

The methods that could be performed by VISTA are described in a Home Office User's Manual Release 6.0, which states that "The information included in this manual is considered proprietary and may not be disclosed to unauthorized persons. This information is intended for use solely by authorized Mercedes-Benz employees and Mercedes-Benz authorized dealers."

OPINION

A. <u>Defendants' Affirmative Defenses and Counterclaims Related to Breach of Contract</u>

I begin with defendants' affirmative defense relating to the release of plaintiff's claims, and defendants' related counterclaims for breach of contract. In their motion for summary judgment, defendants contend that plaintiff's infringement claims are released and that plaintiff and third party defendants have breached a settlement agreement between

40

defendants and third party defendant Orion IP.  In the settlement agreement, Orion IP licenses "Orion Patents"; releases activities that would have been licensed; and represents and warrants that it has not assigned any rights related to the Texas litigation.  Defendants contend that plaintiff and third party defendants are alter egos of one another, which defendants believe leads to two conclusions: (1) the alter ego status of Orion IP and plaintiff make the '658 patent a licensed and released "Orion Patent" under the terms of the settlement agreement; and (2) plaintiff and third party defendants are bound by the terms of the settlement agreement and may be held liable for their breach.  I have already determined that plaintiff and third party defendants are alter egos of one another for the purpose of establishing a prima facie case for jurisdiction.  Order, dkt. #212 at 20-23.  Now I must determine whether a reasonable jury could come to the same conclusion on the current record.  Before turning to who may be liable under the contract, I consider the scope of liability available under the contract.

1.  <u>Scope of liability</u>

The parties dispute whether plaintiffs breached and have released their present claims under Article 2.1 or 3.5 of the settlement agreement and whether defendants have been damaged by Orion IP's apparent breach of the warranty and representation clause, Article 8.1(a)(iii).  In an order dated October 15, 2007, I concluded that there was no breach of

contract under Articles 2.1 or 3.5:

> Defendants point to several other provisions in the Licensing Agreement that third party defendants allegedly breached, including Articles 2.1 and 3.5, but these provisions do not relate to plaintiff's filing suit for infringement of the '658 patent.  Article 2.1 limits the release explicitly to "activities that would have been licensed under this Agreement if they had been performed on or after the Effective Date."  Therefore, the release covers only activities that would have been licensed, and only activity performed before the Effective Date.  The only technology licensed is technology "falling within the scope of one or more claims of the Orion Patents."  The parties agree that the '658 patent is not itself an "Orion Patent."  Thus, Article 2.1 is of no use to defendants.
>
> As for Article 3.5, its context shows the provision is limited to use by "third parties," that is, persons other than the parties to the agreement and their related companies.  Article 3.5 states that there is "no release or license . . . to any Third Party . . . for the combination [or use] of the Licensed Technology with any other items. . . except as necessary for the normal and intended use of the Licensed Technology themselves."  Thus, Article 3.5 does not provide any protection to defendants.

Order, dkt. #212 at 36.37.

In spite of this ruling, defendants make several arguments for concluding that plaintiff's claim should be released under Articles 2.1 and 3.5, many of which relate to questions already answered:  whether Article 2.1 is broader than the license provision and whether it covers current activities.  As I concluded, Article 2.1 is limited to activity that was performed before the effective date that would have been licensed had it been performed after the effective date.  Id.  To the extent defendants are seeking reconsideration of this conclusion, nothing in their briefs has convinced me that my reading of the contract

42

language was in error.

Defendants' new contention is that the '658 patent *is* licensed, once the alter ego status of third party defendants and plaintiff is established.  The gist of defendants' argument is as follows: The agreement licenses "Orion Patents," which includes "any patents acquired by Orion after the Effective Date"; under the alter ego theory, plaintiff *is* Orion; therefore, the '658 patent, acquired by plaintiff after the Effective Date, is an Orion Patent. However, the agreement limited the patents licensed to patents acquired by Orion while defining as distinct "Orion" and "Orion Related Companies."  The terms of the agreement protect defendants from suit by both Orion and Orion Related Companies for patents licensed, but limits licensed patents to those held and acquired by Orion.  Thus, the parties' agreement anticipated the existence of companies closely related to Orion but offered a more limited license.  Defendants' theory would require the court to reform the contract to disregard the distinctions between Orion and Orion Related Companies and grant a license on a patent the parties never took into consideration.  Unfortunately, the alter ego doctrine does not reach so far.  It is not a means for reforming contracts, but rather a remedial tool designed to expand the scope of sources of potential relief.  In re Texas American Express, Inc., 190 S.W.3d 720, 725-26 (Tex. Ct. App. 2005) (Piercing the corporate veil is "purely remedial" and merely a means for expanding "scope of potential sources of relief" for corporate liability).  It is true that a contract may be reformed on the basis of fraud, Capitol

43

Rod & Gun Club v. Lower Colorado River Authority, 622 S.W.2d 887, 892 (Tex. Ct. App. 1981), just as a corporate veil may be pierced on the same basis, Castleberry v. Branscum, 721 S.W.2d 270, 272 (Tex. 1986).  However, defendants have not argued reformation or attempted to establish its elements, and so are not entitled to that form of relief.

Because the '658 patent is not an "Orion Patent" and because defendants are not "Third Parties" under the settlement agreement, I will deny defendants' motion for summary judgment and grant plaintiff and third party defendants' motion for summary judgment on defendants' affirmative defenses and claims for breach of contract on the basis of Article 2.1 and Article 3.5.

One breach of contract issue remains.  In the October 15 order, I concluded, for two reasons, that defendants had stated a claim for breach of contract on the basis of Article 8.1(a)(iii).  First, the provision included a warranty that Orion IP had not transferred any causes of action arising from the same set of facts involved in the Texas lawsuits.  Second, the allegations stated a claim for breach because Orion IP could have brought a claim for infringement under the same set of facts crucial to the infringement allegations present in the Texas lawsuits.  Order, dkt. #212 at 35-36.

Plaintiff contends that defendants were not damaged by any alleged breach of Article 8.1(a)(iii) because defendants knew or should have known that Orion IP had assigned the '658 patent before it signed the agreement, and had Orion IP not assigned the '658 patent,

*it* could have filed suit instead of plaintiff.  Plaintiff and third party defendants' argument requires speculation as to what defendants would or would not have done had Orion not breached the provision; this is no ground for dismissal on summary judgment.

In addition, plaintiff and third party contend that Article 8.1(iii) does not apply because the '658 patent is not "related" to the Texas lawsuits.  I have interpreted the language of the representation and warranty clause to require no more than that a cause of action related to the '658 patent involve the same set of facts crucial to the infringement allegations present in the Texas lawsuits.  Order, dkt. #212 at 35-36.  In the Texas lawsuits, Orion IP contended that a certain "Build and Price" feature found on defendants websites was infringing the patents asserted in that case.  In the present case, plaintiff contends that certain features related to vehicle configuration, product comparison and profile information related to those same websites infringe the '658 patent and that there is sufficient evidence for a jury to find the '658 patent related to those activities.  Because the same websites are allegedly infringing and involve certain features in common, a triable issue of fact remains as to whether Article 8.1(iii) was breached by Orion IP's assignment of rights in the '658 patent.

2 Liability of plaintiff and third party defendants under alter ego doctrine

Although Orion IP can be held liable for its breach of contract, the liability of plaintiff

45

and the other third party defendants must be established.  As I have explained, the alter ego
doctrine allows corporate form to be disregarded and the acts of controlling and controlled
entities to be attributed to one another.  Taurus IP v. DaimlerChrysler Corp., 519 F. Supp.
2d 905, 918-19 (W.D. Wis. 2007) (citations omitted).  Because the law of the state of
incorporation of a veiled entity governs when and whether its corporate form should be
disregarded, I must consider Texas law for third party defendant Orion IP and Wisconsin
law for third party defendants Plutus IP Wisconsin and plaintiff.  Id. at 919.


a.  Orion IP and Spangenberg

        Under Texas law, the corporate veil may be pierced, and shareholders, officers and
directors may be held liable for acts normally insulated by the corporate form "when these
individuals abuse the corporate privilege."  Castleberry, 721 S.W.2d at 271.  The rules for
piercing the corporate veil apply not only to corporations, but also to limited liability
companies.  McCarthy v. Wani Venture, A.S., ___S.W.3d___, 2007 WL 1845088, 14-15
(Tex. App.-Houston 2007) (citing Castleberry, 721 S.W.2d at 272).

        The corporate veil of a Texas corporation or limited liability company may be pierced
when the corporate fiction is used as a means of perpetrating fraud.  Castleberry, 721
S.W.2d at 272.  Alternatively, the veil may be pierced when the corporation is an alter ego
of an individual.  Id.  The alter ego theory applies "when there is such unity between

46

corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice." Id.  A court should consider the

> total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes.

Id.  Moreover, under Castleberry, no showing of actual fraud is necessary to pierce the corporate veil; rather, a showing that an action was "so grossly unfair as to constitute constructive fraud" will suffice.  Id. at 273.

Plaintiff and third party defendants contend that the Texas Business Corporations Act was revised to require a showing of "actual fraud" for any claim of contractual ability. TEX. BUS. CORP. ACT ANN. art. 2.21 (Vernon Supp. 2005)).  However, they overstate the scope of the statute slightly; it limits alter ego liability only for shareholders, owners, subscribers and affiliates, not directors, officers, managers or members.  Id., art. 2.21A.  In the rare instance in which an individual meets the alter ego requirements under Castleberry but is not a shareholder or owner, no showing of actual fraud is required to establish liability.

There is no evidence that Spangenberg is a shareholder or owner of Orion IP; instead, the facts establish that he has been a manager of Orion IP since its formation in 2004. Therefore, no actual fraud is required in order for Spangenberg to be held liable under the "alter ego" doctrine.

47

Triable issues of fact remain whether Orion IP is Spangenberg's alter ego. Spangenberg has demonstrated substantial control over Orion IP. Orion IP has no employees, and Spangenberg is the only natural person who has ever made business decisions for Orion IP. He has unobstructed authority to file lawsuits on behalf of Orion IP. He executed merger documents as Orion IP's sole member and manager, authorized Orion IP to file the Texas lawsuits against defendants, authorized the transfer of the '658 patent, engaged in settlement negotiations and agreed to a settlement agreement with defendants on Orion IP's behalf.

Although all of this control is consistent with the role of a sole member and manager, the timing of the transfer of the '658 patent from Orion IP, Spangenberg's negotiations with defendants in the Texas lawsuits and Spangenberg's control over later transfers of the '658 patent are sufficient evidence for a reasonable jury to find that Spangenberg used Orion IP's transfer of the '658 patent and settlement negotiations for his own purposes. Shortly after Spangenberg filed suit on Orion IP's behalf against defendant Chrysler, Spangenberg assigned the '658 patent to Caelum IP, another entity he managed, on behalf of Orion IP. Next, Spangenberg assigned the '658 patent to Constellation IP, yet another entity he managed, three days before serious settlement negotiations occurred. The assignment was not recorded until one day before the settlement agreement was signed.

At the same time, during settlement, Spangenberg never specified to defendants

48

which companies were Orion Related Companies or what assets those companies owned. During the crucial settlement agreements, Spangenberg allowed defendants to believe that the settlement agreement "covered everything" owned by the Orion Related Companies, stating "yes" to the question "Now, this covers everything in your portfolio . . . this is everything you have, correct?"   He indicated that the settlement would make it so defendants would never hear from him again.  Later, Spangenberg reviewed the '658 patent and shortly thereafter assigned the patent on behalf of Constellation IP to Taurus IP, as its sole manager, and then merged the company with plaintiff in Wisconsin and authorized suit against defendants on plaintiff's behalf.  Although the record does not establish what Spangenberg's personal interest might be, the behavior of Orion IP and the other corporations were aligned, and Spangenberg acted on behalf of all of them without interference or restriction.  Moreover, Spangenberg's actions exposed Orion IP to a risk of loss (by counterclaim for breach of contract) while allowing plaintiff, a separate company, an opportunity to gain from the same activity threatening to harm Orion IP (a patent infringement suit).  Thus, the evidence is sufficient for a reasonable jury to infer that Spangenberg must have had some sort of a personal interest.  The circumstances in which the '658 patent were assigned by Spangenberg on the companies' behalf before, during and after settlement with defendant Chrysler would allow a reasonable jury to conclude that all separateness between Orion IP and Spangenberg had ceased with respect to the '658 patent

and that to hold only the corporation liable would result in injustice.

Moreover, a jury could find that Spangenberg used Orion IP and the related companies to conceal a related patent, settle a related lawsuit (by leading defendants to believe they were getting more protection than they were) and return to sue the same defendants later.  Even though it is undisputed that Spangenberg spent "no time" with the '658 patent before January 2007, he was the manager of Orion IP and in the business of enforcing patents when Orion IP received 14 patents and split them off.  Even though defendants had received the '658 in the documents produced and may have had an opportunity to review the patent, its ownership was unclear at the time of settlement.  Therefore, a reasonable jury could find Spangenberg's actions to be "so grossly unfair as to amount to constructive fraud."  Castleberry, 721 S.W.2d at 273.

Because triable issues of fact exist on the question whether Orion IP acted as an alter ego of Spangenberg when it transferred the '658 patent, negotiated the Texas lawsuits and settled with defendants, he shall remain a third party defendant.  Plaintiff's motion for summary judgment will be denied with respect to defendants' claim that Orion IP and Spangenberg should be liable for the warranties and representations found in Article 8.1(iii).

b.  Plaintiff and Plutus IP Wisconsin

No reason exists for plaintiff and Plutus IP Wisconsin to remain as third party

defendants in this case.  Neither party was involved in breaching or furthering the breach of the warranty and representation clause.  Their role came later, in establishing plaintiff in Wisconsin, apparently for the purpose of filing suit.  Under Wisconsin law, a corporate veil may be pierced only if "applying the corporate fiction would accomplish some fraudulent purpose, operate as a constructive fraud, or defeat some strong equitable claim."  Posyniak v. School Sisters of St. Francis, 180 Wis. 2d 619, 636, 511 N.W.2d 300, 308 (Ct. App. 1993) (citation omitted).  The "alter ego" doctrine requires proof of control over an entity regarding a particular transaction attacked as inequitable.  Consumer's Co-Op of Walworth County v. Olsen, 142 Wis. 2d 465, 484, 419 N.W.2d 211, 217-18 (1988). Because neither plaintiff nor Plutus IP Wisconsin engaged in any transaction related closely to Orion IP's alleged breach of the warranty, their corporate forms should be upheld, and plaintiff's motion for summary judgment will be granted on defendants' claim that Plutus IP Wisconsin and plaintiff Taurus IP breached the licensing agreement.

## B. Plaintiff's Patent Infringement Claims

Plaintiff alleges infringement of independent claim 16 and dependent claims 19, 22, 23 and 27 of the '658 patent by defendant Chrysler's and defendant Mercedes-Benz USA's public websites.  (Plaintiff is no longer pursuing its allegations that defendant Chrysler's internal websites and dealer portals, called DealerConnect, infringe.  Plt.'s Resp. Br., dkt.

51

#317, at 20.  In addition, plaintiff has agreed to the dismissal of defendants Chrysler Financial and Chrysler Holding if defendants make it clear that neither of these defendants ever owned or operated the accused websites, Plt.'s Resp. Br., dkt. #317 at 20-21, which defendants have done.  Dft.'s Rep. Br., dkt. #336 at 26.)

1.  Noninfringement

Plaintiff's patent infringement suit is without merit.  I reach this conclusion on two independent grounds: plaintiff has failed to show that defendants' products employ a "user" or "user-defined relationship information," both of which are required to practice the steps of claim 16 of the '658 patent.  These terms appear in steps 3 and 4 of claim 16.  Step 3 discloses "receiving user-defined relationship information" into the system and step 4 discloses "presenting the product knowledge . . . to a user of the system."

The court has construed the term "user" to mean "a person who is capable of creating and editing user-defined relationship information."  The court has construed the term "user-defined relationship information" to mean "the set of rules specified by the user that governs the relationship between data items within the data model" and the related term "user-defined relationship items" to mean "individual rules specified by the user that belong to and interconnect data instance items."  Therefore, the "user" disclosed in claim 16 must be capable of creating and editing the set of rules that governs the relationship between data

52

items within the data model, and both types of "user-defined relationship" rules disclosed in claim 16 must be specified by a user.

According to plaintiff, defendants' products allow a web surfer to create, edit and specify rules governing the relationship between data items by allowing a web surfer to configure vehicles and compare the configured vehicle to dealer inventory vehicles (defendant Chrysler's website) or save multiple configured vehicles to their profile (defendant Mercedes-Benz USA's website). However, none of the activities described create, edit or specify rules; in every instance, plaintiff has failed to show that a web surfer does any more than submit variables for the system to process in accordance with predetermined rules.

a.  Step 3: "receiving user-defined relationship information"

Plaintiff contends that web surfers visiting defendant Chrysler's accused websites are able to "specify rules governing the relationship between data items in the data model" by configuring a vehicle and locating nearby dealers within a specified area and by comparing the configured vehicle to vehicles in the local dealer's inventories. However, the undisputed facts show that the web surfer does not determine the shape of either the rule that applies to searching for dealers or the rule that compares a configured vehicle with dealers' inventories.

Plaintiff appears to argue that by telling the system to search with the variables presented, the web surfer tells the system to apply a rule.  This is not specifying a rule that governs the relationship between data items in the data model as required by the '658 patent.  To specify a rule is not to tell the system that a rule should be applied to variables provided.  Instead, it requires a user to tell the system *how* a rule should relate to the data models.  This the web surfer does not do.

The same is true for the products implemented by defendant Mercedes-Benz's websites.  Even if a web surfer may instruct the system that an "AND" rule should be implemented to attach a configured vehicle to her profile, a user does not instruct the system *how* the vehicle should be related to her profile.  That has been predetermined.

Because there is no evidence that a web surfer specifies any rules governing the relationship between data items in the data model for either defendants' websites, plaintiff has failed to show that a jury could conclude that step 3 of claim 16 is practiced by defendants' products.  Step 3 is a necessary element of claim 16; therefore claim 16 is not infringed by defendants products, and defendants' motion for summary judgment will be granted on plaintiff's claim that defendants' products infringe claim 16.

b.  Step 4:  "presenting the product knowledge . . . to a user of the system."

Even if a web surfer's ability to instantiate rules could be said to "specify" rules,

54

plaintiff still could not establish infringement because a web surfer must be capable of "creating or editing" rules to be a user.  Plaintiff adduces no additional evidence of a user's ability to create or edit rules other than that proposed to demonstrate a user's ability to specify rules.  Where plaintiff's contention that a web surfer "specifies" rules was simply incorrect, its contention that the web surfer "creates" rules by filling in variable amounts is nonsense.  A rule containing variables is not a "rule fragment" as plaintiff contends.  It is simply a rule about what to do with certain variables.  To maintain that a rule is "created" or "edited" every time a variable is entered and processed by software would mean that virtually every user of any software is a rule creator or editor.  That expands the meaning far beyond the scope of the term "user" in the '658 patent and what this court has construed it to mean.

Plaintiff has failed to adduce evidence sufficient to find that a web surfer can edit or create user-defined relationship information.  In addition, plaintiff has adduced no other evidence of a potential "user" as required by step 4, which is a necessary element of claim 16 of the '658 patent.  Therefore, defendants' motion for summary judgment will be granted on plaintiff's claim that defendants' products infringe claim 16.

Because the remaining claims asserted by plaintiff, claims 19, 22, 23 and 27 of the '658 patent, depend from claim 16, defendants' motion for summary judgment will be granted on the ground that defendants' products necessarily do not infringe those claims.

55

Jeneric/Pentron v. Dillon Company, Inc., 205 F.3d 1377, 1383 (Fed. Cir. 2000) ("fundamental principle of patent law that dependent claims cannot be found infringed unless the claims from which they depend have been found to have been infringed").

c.  Doctrine of equivalents

Plaintiff makes no argument for establishing infringement under the doctrine of equivalents, but does contend that it has preserved its right to assert infringement under the doctrine if the court modifies, adds to or clarifies its claim construction ruling.  I disagree. If plaintiff believed that certain terms of the '658 patent not construed before now required construction, it should have argued so.  It did not.  To the extent certain terms were modified, added to, or clarified in the course of this order, it was to describe the scope of those terms as required by the '658 patent.  The doctrine of equivalents is never a good tool to apply to a court's construction of claim terms because it simply dissolves into a motion for reconsideration or clarification of the court's constructions.  Cf. Z Trim Holdings, Inc. v. Fiberstar, Inc., 2008 U.S. Dist. LEXIS 6086, *9-10 (W.D. Wis. 2008)

2.  Anticipation

Patents are presumptively valid.  35 U.S.C. § 282.  A party challenging the validity of a patent has the burden to make its showing by clear and convincing evidence.  Connell

56

v. Sears Roebuck & Co., 722 F.2d 1542, 1549 (Fed. Cir. 1983).  Anticipation is a question of fact:  whether "all aspects of the claimed invention were already described in a single reference."  Scripps Clinic & Research Foundation v. Genentech, Inc., 927 F.2d 1565, 1576-77 (Fed. Cir. 1991).  Generally, the facts relevant to this finding are the reference claimed to be prior art and evidence related to what the reference meant to persons of ordinary skill in the field of the invention.  Id.  Summary judgment on invalidity is appropriate when there are no material facts in dispute and the movant has established invalidity by clear and convincing evidence.  Helifix Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339, 1346 (Fed. Cir. 2000); Oney v. Ratliff, 182 F.3d 893, 895 (Fed. Cir. 1999) ("summary judgment is inappropriate if a trier of fact applying the clear and convincing standard could find for either party").

When addressing the question of anticipation, the court must begin with construction of the patent's claims.  Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1348 (Fed. Cir. 2005).  Next, the court must determine whether a prior art reference discloses each and every limitation of the claim expressly or inherently.  Scripps Clinic & Research Foundation, 927 F.2d at 1576-77.  Prior art anticipates a method claim if it discloses all of the operative steps of the method.  Schumer v. Laboratory Computer Systems, Inc., 308 F.3d 1304, 1309 n.3 (Fed. Cir. 2002).

a.  SC Config and VISTA

Under 35 U.S.C. § 102(b), a patent is not valid if the invention it discloses was either "described in a printed publication" or "in public use or on sale in this country" more than one year before the patent application was filed.  Defendant contends that Marketing Configurator or its successor SC Config and VISTA were in public use or on sale more than one year before the application for the '658 patent was filed and that each discloses the invention claimed in the '658 patent.

Defendants' problem is that plaintiffs have put into dispute defendants' assertion that these applications were ever in "public use or on sale" as required by § 102(b).  Although it appears that Marketing Configurator and SC Config were sold or licensed more than one year before the '658 patent application was filed, plaintiff contends that all use and sale of the applications was secret; the only sale confirmed was made under a licensing agreement showing that Trilogy considered the software to be a trade secret and prohibiting disclosure; the demo given to Chrysler appears to have been considered confidential information; and both the User Guide and software tables were kept confidential.  Although VISTA appeared to be in use by pilot dealers well before the '658 patent application was filed, the parties dispute whether pilot dealers were bound to secrecy in its use.  The User's Manual indicated that the information was proprietary, could not be disclosed to unauthorized persons and was intended for use solely by authorized employees and dealers.  Even though it is

58

undisputed that VISTA "could" be used in person with customers, this does not mean customers would have been able to view what the VISTA program was doing.

Defendants contend that even "secret uses" may constitute a public use under § 102(b) when the invention is commercially exploited, citing <u>Invitrogen Corp. v. Biocrest Manufacturing, L.P.</u>, 424 F.3d 1374, 1381-81 (Fed. Cir. 2005), and cases therein. Although defendants are correct that commercially exploited use is public use even when it is secret, this rule applies only when the use is by the inventor of the patent being challenged. As the Court of Appeals for the Federal Circuit explained in <u>Woodland Trust v. Flowertree Nursery, Inc.</u>, 148 F.3d 1368, 1370-71 (Fed. Cir. 1998),

> Section 102(b), unlike § 102(a), is primarily concerned with the policy that encourages an inventor to enter the patent system promptly, while recognizing a one year period of public knowledge or use or commercial exploitation before the patent application must be filed. Thus an inventor's own prior commercial use, albeit kept secret, may constitute a public use or sale under § 102(b), barring him from obtaining a patent.

> However, when an asserted prior use is not that of the applicant, § 102(b) is not a bar when that prior use or knowledge is not available to the public.

(Citations omitted). Defendants' asserted prior use and sale is not that of the inventor of the '658 patent, but of a third party. To apply the "commercial exploitation" rule in this setting would make no sense; the inventors of the '658 patent had no way of knowing of Trilogy's secret uses of its technology. They should not be punished for a prior use they never knew of.

59

Because the parties dispute whether Marketing Configurator, SC Config and VISTA were ever publicly used or put on sale without obligations of secrecy, defendants' motion for summary judgment will be denied as to their claim that the '658 patent is invalid as anticipated by these products.

b.  the '651 patent

The next question is whether the asserted claims are anticipated by the '651 patent under 35 U.S.C. § 102(e)(2), which states that a patent is not valid if the invention it discloses was described in "a patent granted on an application for patent by another filed in the United States before the invention."

1) Date of the invention

The threshold question in determining anticipation under 35 U.S.C. § 102(e)(2) is whether a patent claimed to be prior art was "filed in the United States before the invention" at issue.  Id.  It is undisputed that the application for the '651 patent was filed by Trilogy on September 3, 1996 and the application for the '658 patent was not filed until September 10, 1997.  However, plaintiff contends that the '658 patent was invented as early as June 10, 1996.

The date of invention of a patent is presumed to be the filing date of the application.

60

Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc., 796 F.2d 443, 449 (Fed. Cir. 1986).

In order to overcome the presumed date of invention and establish an earlier date, plaintiff

must offer evidence sufficient for a jury to find that the subject matter of the '658 patent was

invented on that earlier date.   Mahurkar v. C.R. Bard, Inc., 79 F.3d 1572, 1576-77 (Fed.

Cir. 1996).  Only then does it become defendants' burden to establish otherwise by clear and

convincing evidence.  Id.

The rules for establishing a date of invention earlier than the filing date have been

borrowed from 35 U.S.C. 102(g), the basic rule for determining priority.  Mahurkar, 79 F.3d

at 1577.  An earlier invention date may be established on a showing that before the filing

of an application, an invention was either (1) reduced to practice or (2) conceived of before

reasonable diligence was exercised to reduce it to practice.  Id.  An invention is considered

to have been "conceived of" when an inventor has "formed in his or her mind a definite and

permanent idea of the complete and operative invention, as it is hereafter to be applied in

practice."  Id. (citations omitted).

Plaintiff's evidence of an invention date of June 10, 1996 fails to meet the burden of

production required to overcome the filing date presumption.  The only indication that the

subject matter of the '658 patent was "conceived of" or "reduced to practice" by June 10,

1996 is the fact that the computer file containing the data model for the '658 patent was

created on that day.  No reasonable jury could find from that fact that the inventors had

61

formed a "definite and permanent idea of the complete and operative invention" on that date.  Even if it could, that evidence is of no significance in light of the clear and convincing evidence marshaled by defendants:  the computer file was last modified on December 11, 1996, much later than the original file was created; nearly every page of the data model was stamped with the December 11, 1996 date; neither inventor recalls the invention date; one of the inventors could not recall when the data model had been finalized; and the facts do not show when the bulk of the work on the data model had been completed.   From defendants' evidence, no reasonable jury could find an invention date for the invention disclosed in the '658 patent any earlier than December 11, 1996.  Because the Trilogy '651 patent was filed on September 10, 1996, it is prior art under 35 U.S.C. 102(e)(2).

2) Claim 16 of the '658 patent

Defendants have the burden of showing by clear and convincing evidence that the '651 patent discloses all operative steps of claim 16 of the '658 patent.  However, defendants need not demonstrate that the Trilogy '651 patent uses the same words expressed in claim 16 of the '658 patent, only that a person of ordinary skill in the art would understand the description found in the Trilogy '651 patent as disclosing all the steps of claim 16 and could have combined the description in the Trilogy '651 patent with his own knowledge to make the claimed invention.  Helifix Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339, 1346-47 (Fed. Cir.

62

2000) (citing In re Donohue, 766 F.2d 531, 533 (Fed. Cir. 1985)).

With the terms of the '658 patent construed, what remains is a determination of the meaning and scope of the language found in the supposed prior art, that is, the Trilogy '651 patent. Scripps Clinic & Research Foundation, 927 F.2d at 1576-77. If the scope of the language of a prior art patent, properly construed, clearly discloses the steps of the present invention, the patent is invalid as anticipated.

a) preamble

Plaintiff does not deny that the preamble of the '658 patent is disclosed by the '651 patent.

b) step 1: defining a data model . . .

Step 1 of claim 16 of the '658 patent discloses "defining a data model of data categories, the data model establishing relationships between data categories." The Trilogy '651 patent discloses defining sets of parts and related groups of parts and defining relationships between sets of parts. This is sufficient to disclose the inventive idea disclosed in step 1.

Plaintiff denies that the Trilogy '651 patent discloses the structure of its data model or discloses a data model using "categories." However, the patent identifies the "data model"

63

as nothing more than a structure that contains categories, establishes relationships between data categories and establishes the manner in which the product knowledge is presented. '658 pat., col. 3, lns. 6-18. The Trilogy '651 patent discloses this by establishing relationships between groups of parts, defining relationships and presenting the invention to a user.

In addition, plaintiff contends that the "data model" and "data category" claimed by the '658 patent must be implemented in object-oriented programming. However, the specification and claims of the '658 patent make it clear that object-oriented programming is merely a preferred embodiment. Although the specification discusses a "data model" that "creates and uses an object-oriented programming environment," '658 pat., ln. 5, cols. 28-29, it does so in the context of discussing Figure 1, which it described expressly as an "example system." Moreover, the specification discusses object-oriented programming concepts (classes, objects, pointers, etc.), '658 pat. cols. 5-6, but claim 16 of the '658 patent does not use object-oriented language, instead describing "data categories," "data instance items," and "interconnection." It is not until claim 19 that the term "object" is mentioned.

Plaintiff has conceded that a "data category" is not limited to object-oriented language concepts. At the claim construction hearing held in this case on September 21, 2007, plaintiff's counsel attempted to offer a less restrictive definition of data category. In support of his argument that "data category" would not have achieved what "data instance items"

64

did in the wherein clause, plaintiff's counsel asserted that "data category" is "not a computer science term," but rather "what you see on the interface when you're on the screen and . . . see a category and it says you can pick red, yellow or green.  Now behind the scenes how the computer represents that, that's up to the modeler or whoever was building the system." Transcript, dkt. #188 at 34:16-23.  Thus, under plaintiff's position, which it used to support its construction of "data instance items," "data category" is disconnected from the internal structure of a computer program and relates to only the general grouping of information shown externally.  Plaintiff is bound by this argument; it cannot change it midstream.

The Trilogy '651 patent discloses step 1 of claim 16 of the '658 patent by defining sets of parts and related groups of parts and defining relationships between sets of parts.

c) step 2:  receiving in the computer system . . .

Step 2 of claim 16 of the '658 patent discloses "receiving in the computer system one or more particular data items corresponding to one or more of the data categories."  The Trilogy '651 patent discloses receiving parts related to sets or groups of parts into the system.  Plaintiff's only contention is that "parts" have not been shown to be "data items." Under the definition provided by the court, a "part" need only disclose an "item of information related to products offered for sale by a selling entity."  The Trilogy '651 patent discloses use of the system for "automobiles" and a "parts catalog," making it obvious that

65

"parts" disclose an item of information related to products offered for sale by a selling entity. The Trilogy '651 patent discloses step 2 by disclosing receiving parts related to sets or groups of parts into the system.

d) step 3: receiving user-defined relationship information . . .

Step 3 of claim 16 of the '658 patent discloses "receiving user-defined relationship information for the particular data item, the relationship information relating the particular data item to one or more other data items." The Trilogy '651 patent discloses that "[a] user can drag elements from pane 602 to panes 604-608 to define a product," '651 pat., col. 8, lns. 12-13, and "express a definition," '651 pat., col. 9, lns. 2-3; discloses the ability to define relationships between parts and sets of parts at length, '651 pat., col. 2, lns. 12-21; and illustrates these relationships in several figures, '651 pat., figs. 2, 4, 6. Because the Trilogy '651 patent discloses receiving information from a user to define products and express definitions that relate parts and sets of parts, it discloses step 3.

e) step 4: presenting the product knowledge . . .

Step 4 of claim 16 of the '658 patent discloses "presenting the product knowledge, including information about the particular data item, to a user of the system in a manner

66

established by the data model and the user-defined relationship." Plaintiff does not appear to dispute that step 4 has been disclosed by the Trilogy '651 patent. At any rate, the GUI screen disclosed in figure 6 and discussed in the specification for the Trilogy '651 patent discloses step 4. '651 pat., col. 8, ln. 5 - col. 9, ln. 9, Fig. 6.

f) step 5: wherein the data model is constructed . . .

Step 5 of claim 16 of the '658 patent is a "wherein clause" disclosing: "wherein the data model is constructed from one or more data instance items interconnected using the user-defined relationship items for each data instance item." To disclose the substance of the wherein clause, the Trilogy '651 patent must disclose (1) data instance items interconnected by user-defined rules and (2) constructing a data model from these interconnected data instance items.

First, the Trilogy '651 patent discloses data instance items interconnected by user-defined relationship items. From this court's construction, this involves a group of (a) one or more data items and (b) one or more individual rules specified by the user that belong to and interconnect data instance items interconnected to other such groups. The Trilogy '651 patent discloses parts, sets of parts, and groups of parts. In addition, it discloses allowing a user to define relationships among the parts, sets and groups using relationship rules such as "requires choice," at which time a given part will be related to the rule "requires choice"

67

and the allowable choices may be set. '651 pat, col. 8, lns 12-18, fig. 6. Each "requires choice" rule is represented in a table by information that contains configuration information, the maximum and minimum number of choices allowed and a pointer that points to a specific table representing the group of allowable choices defined by the user. '651 pat., col. 6, 50-53. Thus, when one part or group of parts "requires choice," it is interconnected to a second group of parts by a pointer. Moreover, because the interconnecting "rule" is assigned to the parts or group of parts assigned to the rule, it "belongs" to that group. Therefore, the Trilogy '651 patent discloses interconnected groups containing data items and user-defined rules that interconnect the groups.

Next, a data model is constructed of these interconnected groups. The patent discloses that "[t]he invention takes the definitions created by a user and supplements and compresses the definition when necessary to create an internal representation. The internal representation is used during configuration to initialize and validate a configuration based on user input." '651 pat., col. 3, lns. 7-11. Therefore, the Trilogy '651 patent discloses constructing a data model from interconnected groups containing data items and interconnecting rules specified by the user. This is sufficient to disclose step 5.

Because there are no disputed issues of fact related to the passages and figures of the specification of the Trilogy '651 patent and because these passages and figures so clearly disclose each steps taught in claim 16 of the '658 patent, claim 16 is invalid as anticipated,

68

and defendants' motion for summary judgment will be granted in that respect.

### 3) Claim 19 of the '658 patent

Claim 19 of the '658 patent discloses a method "creating data objects representing the data categories."  The facts do not show that the Trilogy '651 patent discloses the use of objects; therefore, defendants' motion for summary judgment will be denied as to defendants' claim that claim 19 is invalid as anticipated by the '651 patent.

### 4) Claims 22 and 23 of the '658 patent

Claims 22 and 23 of the '658 patent depend from claim 16 and each includes the additional limitation "selecting a portion of the product knowledge for presentation to the user."  Defendants have failed to produce clear and convincing evidence that the Trilogy '651 patent discloses a method whereby only a portion of the product knowledge may be presented to the user.  The passages cited by defendants simply allow a user to see "the external representation," not a portion of it.  Therefore, defendants' motion for summary judgment will be denied as to defendants' claims that claims 22 and 23 are invalid as anticipated by the Trilogy '651 patent.

5) Claim 27 of the '658 patent

Claim 27 of the '658 patent depends from claim 16 and includes the additional limitation of "using a graphic user interface configured and arranged to facilitate creating the user-defined relationship item."  The Trilogy '651 patent discloses using a graphic user interface to make it "easy [for the user] to understand," '651 pat., col. 9, ln. 1, and allowing the user to "drag elements" from one pane to another to define a product or assign rules. '651 pat., col. 8, lns. 12-13.  This meets the terms of claim 27; therefore, claim 27 is invalid as anticipated by the '651 patent and defendants' motion for summary judgment will be granted as to their claim that claim 27 of the '658 patent is invalid as anticipated by the Trilogy '651 patent.

ORDER

IT IS ORDERED that

1.  Plaintiff Taurus IP, LLC and third party defendants Plutus IP Wisconsin, LLC and Orion IP, LLC's motion to dismiss defendants DaimlerChrysler Corporation, DaimlerChrysler Company, LLC, Mercedes-Benz USA, Chrysler, LLC, Chrysler Holding, LLC and Chrysler Financial, LLC's breach of contract claims and affirmative defenses (dkt. #270) is DENIED.

2.  Third party defendant Erich Spangenberg's motion to dismiss defendants' breach

70

of contract claims and affirmative defenses (dkt. #284) is DENIED.

3.  Third party defendant Erich Spangenberg's motion to dismiss for lack of personal jurisdiction (dkt. #280) is DENIED.

4.  Defendants' motion to supplement amended counterclaims and complaints (dkt. #201) is DENIED.

5.  Defendants' motion to strike (dkt. #359) is DENIED as unnecessary.

6.  Defendants' motion to file a reply brief (dkt. #381) is DENIED as moot.

7.  Plaintiff's motion for leave to file a surreply (dkt. #203) is DENIED.

8.  Defendants' motion for summary judgment on the grounds that plaintiff's claims are released (dkt. #156) is DENIED.

9.  Plaintiff and third party defendants' motion for summary judgment (dkt. #235) is GRANTED on defendants' claims that:

      (a)  plaintiff and third party defendants breached Articles 2.1 and 3.5 of the licensing agreement; and

      (b)  plaintiff and third party defendant Plutus IP Wisconsin, LLC breached Article 8.1(iii) of the licensing agreement.

10.  Plaintiff and third party defendants' motion for summary judgment (dkt. #235) is DENIED on defendants' claims that third party defendants Orion IP, LLC and Erich Spangenberg breached Article 8.1(iii) of the licensing agreement.

11.  Defendants' motion for summary judgment (dkt. #286) is GRANTED on plaintiff's claims that

(a)  defendants DaimlerChrysler Corporation, DaimlerChrysler Company, LLC, Chrysler, LLC, Chrysler Holding, LLC and Chrysler Financial, LLC directly and indirectly infringed claims 16, 19, 22, 23 and 27 of the '658 patent by making, using, offering products for sale, or selling products or services available for configuration at internal dealer websites and portals or at www.daimlerchrysler.com, including www.chrysler.com, www.dodge.com, www.jeep.com;

(b)  defendant Mercedes-Benz USA, INC. directly and indirectly infringed claims 16, 19, 22, 23 and 27 of the '658 patent by making, using, offering products for sale, or selling products or services available for configuration at internal websites and dealer portals or at www.daimlerchrysler.com, including www.mbusa.com, which is linked to www.daimlerchrysler.com;

and plaintiff's complaint is DISMISSED as to all defendants.

12.  Defendants' motion for summary judgment (dkt. #286) is GRANTED on defendants' claims that:

(a)  claim 16 of the '658 patent is invalid under 35 U.S.C. § 102(e)(2) as anticipated by the prior art;

(b)  claim 27 of the '658 patent is invalid under 35 U.S.C. § 102(e)(2) as

anticipated by the prior art.

13.   Defendants' motion for summary judgment (dkt. #286) is DENIED on defendants' claims that claims 19, 22 and 23 are invalid as anticipated.

14.   Defendants' counterclaim for breach of contract is DISMISSED as to plaintiff Taurus IP, LLC and defendants' third party complaint for breach of contract is DISMISSED as to third party defendant Plutus IP Wisconsin, LLC.

Entered this 25th day of February, 2008.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

73