IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

TAURUS IP, LLC,[1]

                  Plaintiff,

        v.

DAIMLERCHRYSLER CORPORATION,
DAIMLERCHRYSLER COMPANY, LLC,
MERCEDES-BENZ USA, INC.,
CHRYSLER, LLC,
CHRYSLER HOLDING, LLC and
CHRYSLER FINANCIAL, LLC,

                Defendants.

OPINION and ORDER

07-cv-158-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MERCEDES-BENZ USA, INC and
DAIMLERCHRYSLER COMPANY, LLC,

                Third Party Plaintiffs,

        v.

TAURUS IP, LLC, ORION IP, LLC,
PLUTUS IP WISCONSIN, LLC, and

---

[1]In an order dated February 29, 2008, I amended the caption for the purpose of trial, removing Taurus and other former parties from the caption to avoid confusing the jury. For these post-trial motions, I have amended the caption to return it to its state at the time of summary judgment.

1

ERICH SPANGENBERG,

                    Third Party Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This civil action for patent infringement was filed on March 20, 2007.  On February 25, 2008, I granted defendants' motion for summary judgment on plaintiff's infringement claims filed by the Chrysler and Mercedes-Benz defendants after I found that defendants' products did not infringe plaintiff's United States Patent No. 6,141,658 (the '658 patent) and that certain claims of the '658 patent were invalid as anticipated.  At the same time, I denied in part plaintiff's and third party defendants' motion for summary judgment on defendants' breach of warranty claim.  Defendants proceeded to trial on their claim that, in transferring the '658 patent before third party defendants Orion IP, LLC entered into a settlement of patent litigation in Texas, Orion IP, LLC and Erich Spangenberg breached the representation and warranty clause contained in the settlement agreement with defendants. The jury returned a verdict against Orion IP, LLC, finding that it had breached the settlement's representation and warranty clause.  The amount of damages and defendants' contention that Orion's corporate veil should be pierced to reach Erich Spangenberg were left for post-trial briefing.

While those issues were being briefed, the parties raised several other matters. Defendants moved for a permanent injunction; an award of attorney fees against Orion IP,

LLC both as damages and as fees allowable to "prevailing parties" in Texas breach of contract suits; an award of attorney fees against Taurus IP, LLC under 35 U.S.C. § 285; and additional sanctions against Taurus, IP, LLC, Orion IP, LLC and Spangenberg.  Taurus moved for relief from the summary judgment ruling of invalidity, arguing that it had discovered "new evidence."  Spangenberg and Orion IP, LLC moved for reconsideration of the ruling that Spangenberg had engaged in sanctionable behavior, moved for leave to conduct additional discovery and moved to compel disclosure of privileged information offered as in camera evidence during the hearing on sanctions.

The post-trial disputes will be resolved as follows.  (1) Defendants' motion for permanent injunction will be denied because the injunction they request is overly broad and unnecessary; (2) the corporate veil will not be pierced to make Spangenberg personally liable for a judgment to be entered against Orion IP, LLC because there is insufficient evidence that Orion IP, LLC is likely to evade a judgment entered against it; however, Spangenberg and Orion IP, LLC will be enjoined from dissipating the assets of Orion IP, LLC; (3) defendants' motion for attorney fees from Taurus IP, LLC under 35 U.S.C. § 285 will be granted and Taurus IP, LLC will be jointly and severally liable with Orion IP, LLC for $1,644,906.12; (4) defendants' motion for an award of additional attorney fees against Orion IP, LLC for its breach of warranty will be granted in the amount of $2,194,510.25;(5) defendants' motion for additional sanctions against Taurus IP, LLC, Orion IP, LLC and

3

Spangenberg for their behavior at trial will be denied because the behavior to which defendants object does not warrant additional sanctions; (6) Taurus's motion for relief from the summary judgment ruling of invalidity will be denied because Taurus could have discovered the allegedly new evidence sooner had it been more diligent; (7) Orion IP, LLC's and Spangenberg's motion for reconsideration of the ruling that Spangenberg engaged in sanctionable behavior will be denied because I find clear and convincing evidence that Spangenberg was responsible for Anderson's attempt to improperly influence a witness and this behavior warrants the sanctions imposed against the company for which he was acting; (8) Orion IP, LLC's and Spangenberg's motion for leave to conduct additional discovery will be denied because Orion IP, LLC and Spangenberg have failed to demonstrate "good cause" for their failure to resolve their discovery disputes within the scheduling deadlines; (9) Orion IP, LLC's and Spangenberg's motion to compel disclosure of unredacted versions of the privileged letter sent by Anderson and the in camera testimony of Anderson will be denied because defendants have offered to release a redacted version of the transcript (dkt. #543) that contains all the information I relied upon to determine that Spangenberg's behavior was sanctionable.

I.  MOTION FOR PERMANENT INJUNCTION (DKT. #510) AND

DETERMINATION OF ALTER EGO LIABILITY (DKT. #496)

The parties have proposed findings of facts related to the issues of defendants' motion for permanent injunction and Spangenberg's alter ego liability.  Because the parties' findings of facts for these separate issues overlap, I make the following findings of fact in connection with both issues.

Before I turn to the facts, I note that defendants objected to several facts proposed by plaintiff and third party defendants, asserting that it is too late for plaintiff and third party defendants to produce evidence at a level of detail they refused to produce during discovery.  It is too late for defendants to raise discovery disputes.  These objections will be disregarded.  I find the following facts to be material and undisputed.

UNDISPUTED FACTS

A.  <u>Spangenberg, IP Navigation and the Orion Related Companies</u>

1.  <u>IP Navigation and Acclaim</u>

Spangenberg owns IP Navigation, LLC, a company that provides receptionist and management support to several limited liability companies.  Spangenberg is employed by IP Navigation to act as manager of limited liability companies that are, generally speaking, in the business of licensing and enforcing patents (but generally not in the business of

5

practicing any of the patented inventions). These companies include Orion IP, LLC, Taurus IP, LLC, Plutus IP, LLC, Plutus IP Wisconsin, LLC, Constellation IP, LLC and Caelum IP, LLC. IP Navigation has received more than $5 million for services provided to these companies. Spangenberg's salary from IP Navigation for 2007 was $133,458.28.

The companies managed by Spangenberg are organized in a hierarchical structure and ultimately owned by a company called Acclaim Financial Group, LLC, which in turn is 99% owned by Spangenberg's wife, Audrey Spangenberg, and 1% owned by Spangenberg's minor child, Christian Spangenberg. At times, Spangenberg consults with the owners of Acclaim and with legal, financial and tax advisers before making managerial decisions for the various companies.

## 2. Plutus

Plutus is owned by Acclaim Financial Group, which provided Plutus's initial capitalization of $1,000. Plutus owns a number of companies that license patents. Either directly or indirectly, Plutus currently owns or is the sole member of Orion IP, LLC, Constellation and Plutus IP Wisconsin. (For the purpose of the post-trial motions, I refer to Plutus, Orion IP, LLC, Constellation, Plutus IP Wisconsin and Taurus collectively as the "Orion Related Companies.").

Plutus provides cash management services and investment capital to the other Orion

6

Related Companies.  Orion Related Companies make requests for money either up the chain of companies or directly to Plutus, which provides the money either down the chain or directly to a requesting company.  "Early on," Orion Related Companies's requests for money were made directly to Acclaim Financial Group.

As the manager of the various entities, Spangenberg requests funds from Plutus and authorizes funds to be disbursed from Plutus.  For example, as manager of Taurus, Spangenberg might ask Spangenberg, as manger of Plutus, for an advance, at which point Spangenberg will decide whether to grant Spangenberg's request.  The transactions between the entities are made in writing and reflected in the separate books and records of those entities.  Plutus acquired a $10 million line of credit to fund its operations and the subsidiary entitities.

Plutus prepares a consolidated audited financial statement that combines the financial information of all the Orion Related Companies without distinguishing among the revenue, expenses, property, assets, and liabilities of each company.

2. Orion

On January 6, 2004, Spangenberg executed the formation documents of Orion IP, LLC, organized under the laws of the state of Delaware.  Orion IP, LLC was capitalized with $1,000.  Spangenberg was the manager of Orion IP, LLC.

7

Orion IP, LLC maintained its own bank accounts and separate financial systems and records, including independent financial statements that reflected Orion IP, LLC's operation costs.   In addition, Orion IP, LLC filed separate state tax returns and did not file consolidated returns; however, because Orion IP, LLC was taxed by the federal government as a partnership, Acclaim Financial Group reported its income for federal tax purposes.

In March of 2006, Orion IP, LLC merged with a newly created company with the same name, third party defendant Orion IP, LLC, which was organized under the laws of the state of Texas.  (For the sake of this opinion, the corporations may be treated as one and the same, as the parties have acknowledged.  Where necessary to distinguish the two companies, they will be referred to as "Orion IP Delaware" and "Orion IP Texas."  Elsewhere, they will be referred to jointly as "Orion.")   Spangenberg executed the merger documents.   Orion's corporate office is in Marshall, Texas.  Orion has no employees.  Orion has never marketed or sold any products except its intellectual property.  However, Orion has contracts with more than 75 vendors, licensees and attorneys that employ hundreds of individuals to perform services on Orion's behalf.

Orion has maintained its own bank accounts, separate financial systems and records, including independent financial statements that reflect Orion's operation costs and separate contracts with its vendors.  In addition, Orion filed separate state tax returns and did not file consolidated returns; however, because it was taxed by the federal government as a

8

partnership, Acclaim Financial Group reported its income for federal tax purposes.

As of April 21, 2008, Orion had a bank balance in excess of $4 million.  In addition, Orion has a judgment for an amount in excess of $45 million, accounts receivable of approximately $5 million and liabilities in the ordinary course of less than $100,000. However, in his role as Orion's manager, Spangenberg has transferred approximately $19 million to Plutus; this money has been commingled with Plutus's other funds.

As manager of Orion, Spangenberg does not need authority from any other person to file lawsuits on Orion's behalf and does not need express authority to enter into any settlement agreements on Orion's behalf.

Neither Orion IP Delaware nor Orion IP Texas has ever failed to satisfy its debts in the ordinary course of business.  Orion IP Texas has paid expenses in excess of $20 million since its formation in 2006 without defaulting on any contracts or agreements.

3.  Caelum and Constellation

When Caelum was in existence, Spangenberg was its manager.  In February of 2006 Caelum merged into Constellation.  Spangenberg authorized the merger of Caelum and Constellation in his roles as manager of Plutus, Caelum and Constellation.

Constellation does not have employees, but does retain the services of independent contractors, including IP Navigation, LLP.  Constellation's business address is the same as

9

IP Navigation's and Orion's.

Constellation's business is the ownership and licensing of intellectual property. Constellation has entered into licensing agreements as a result of litigation in which it was a plaintiff.


4. Plutus IP Wisconsin and Taurus

Plutus provided the initial capitalization for Plutus IP Wisconsin and owns it. Plutus IP Wisconsin's primary operating expenses are legal fees. Plutus IP Wisconsin receives funds from Plutus or distributions from Taurus. Plutus IP Wisconsin has no employees.

Although Plutus IP Wisconsin owns Taurus at present, when Taurus was formed, it was owned by the entity known simply as Plutus. Plutus IP Wisconsin was formed on April 4, 2007, nearly a month after Taurus was formed and after Taurus filed this suit against defendants.

As manager of Plutus, Spangenberg authorized Taurus's formation documents, and authorized $1,000 from Plutus to capitalize Taurus. Spangenberg formed Taurus in Wisconsin at least in part for jurisdictional reasons. Spangenberg is the manager and official book and record keeper of Taurus.

Spangenberg signed Taurus's lease agreements in Wisconsin. Spangenberg has verified Taurus's responses to interrogatories in the current suit. The nature of Taurus's

10

business is to own and license patents.  In that regard, Spangenberg has authorized the filing of all the lawsuits in which Taurus was involved as of December 2007.  Those other suits include Taurus IP, LLC v. Hyundai Motor America, Case No. 3:07-cv-004770-bbc, and Taurus IP, LLC v. Ford Motor Company, Case No. 3:07-cv-00481-bbc, both in this court.

Taurus's two principal sources of funds are its licensing revenues and advances from Plutus IP Wisconsin.  When Taurus makes a request for an advance, Spangenberg receives that request as manager of Plutus IP Wisconsin.

## C. Orion Patents, Texas Lawsuits and Settlement Agreement

### 1. Texas lawsuits

On February 24, 2004, shortly after its formation, Orion acquired the rights to fourteen patents from a company called Firepond.  These included United States Patent Nos. 5,615,342 (the '342 patent), 5,367,627 (the '627 patent) and the '658 patent.  As manager of Orion, Spangenberg authorized Orion to acquire the patents from Firepond.  After Orion acquired its patents, it hired lawyers and experts to do an analysis of the patents.  Orion has had at least twelve attorneys working for it on the many patent infringement cases it has filed.

On August 25, 2004, Orion filed suit against Chrysler in the US. District Court in the Eastern District of Texas, alleging that Chrysler's products infringed the '342 and '627

11

patents.  Orion accused Chrysler's car configurator functionality. Approximately one year later, Orion filed suit against Mercedes-Benz USA, Inc. in the same court, alleging that Mercedes-Benz USA's products infringed the '342 and '627 patents as well.  (These two lawsuits will be referred to collectively as the "Texas lawsuits.") Acting as Orion's manager, Spangenberg authorized Orion to file the two lawsuits in Texas.  Orion accused both Chrysler's car configurator functionality and Chrysler's internal, private system called "Dealer Connect" of infringement.

## 2.  Settlement of the Texas lawsuits

Although Orion presented a settlement offer to Chrysler and Mercedes in February 2005, serious settlement negotiations did not start until the end of January 2006.  On February 9, 2006, the parties met to settle the Texas lawsuits.  The parties executed the settlement agreement on Wednesday, February 15, 2006.  Chrysler paid Orion $2.3 million in exchange for the settlement agreement.  A warranty and representation clause in Section 8.1 of the settlement agreement states in part:

> Orion represents and warrants as of the Effective Date that (i) Orion owns the Orion Patents, and has the right to grant releases and licenses with respect to the Orion patents of the full scope set forth herein without payment of any consideration to any Orion Related Company or Third Party (ii) to the knowledge of Orion, the Orion Patents are valid and enforceable, and (iii) *it has not assigned or otherwise transferred to any other Person any rights to any causes of action, damages, or other remedies, or any Orion Patents, claims counterclaims or*

*defenses, relating to the Litigation.*

(Emphasis added).  In addition, the settlement agreement includes licensing and release provisions that licensed a list of patents called "Orion Patents," defined as the '627 patent, the '342 patent and United States Patents Nos. 5,283,868, 5,493,490, 5,625,776 and 6,453,302 and Patent Application No. 99/556,029, it did not include the '658 patent.  In a clause titled "Dispute Resolution," the settlement agreement establishes that if a dispute arises between the parties relating to the agreement, "the parties agree to [first] participate in good faith in . . . mediation and negotiations . . . for a period of 30 days" before attempting to seeking relief before a court.   The settlement agreement contains an integration clause.

3. <u>Transfers of the '658 patent</u>

On August 30, 2004, five days after filing suit against defendant Chrysler in federal court in Texas, Orion assigned its rights in the '658 patent to a company called Caelum IP, LLC.  Spangenberg executed the assignment to Caelum in exchange for a promissory note in the amount of $1 million.  At the time of the assignment, Spangenberg had not studied the '658 patent and did not have a clear idea of its value.  The promissory note was a "bookkeeping entry" made at Plutus reflecting that Caelum owed Plutus a debt.  The assignment was made after Spangenberg received "tax advice" related to a plan that was ultimately not implemented.  The transfer of the '658 patent allowed Orion to "focus on"

13

its remaining patents.  Documentation reflecting the transfer of ownership of the '658 patent was produced in discovery materials to Chrysler's attorneys during the Texas lawsuit.

In February 2006, Constellation acquired rights in the '658 patent as part of the merger of Caelum into Constellation.  The assignment to Constellation was executed three days before the settlement negotiations in the Texas lawsuits and nine days before Orion and Chrysler signed the settlement agreement.  The assignment was recorded in the United States Patent and Trademark Office on February 14, 2006, the day before the parties executed the settlement agreement.  Recorded patent transfers are made publicly available within a few days of the transfer.

On March 10, 2007, five days after Taurus was formed with an initial capitalization of $1,000, and ten days before this suit was filed, Constellation assigned its rights in the '658 patent to Taurus.  Spangenberg authorized the assignment to Taurus as manager of Constellation.

### D. The Present Lawsuit

#### 1. Filing and Taurus's funding for the lawsuit

On March 20, 2007, with authorization from Spangenberg, Taurus filed its complaint in this case, alleging that defendants' website's "car configurator" features infringed the '658 patent and accused Dealer Connect of infringement.  Before filing the

14

lawsuit, neither Orion, Taurus nor Spangenberg contacted Chrysler and Mercedes-Benz USA to explain why they believed defendants' public websites and computer systems infringed the '658 Patent.

Defendants filed answers and counterclaims on April 23, 2007 and amended counterclaims on June 22, 2007, alleging that Taurus, Orion, Erich Spangenberg, Constellation IP, LLC and Plutus IP Wisconsin, LLC had breached a settlement agreement between defendants and Orion.

Taurus had more than six lawyers engaged in the lawsuit.  Taurus's main operating expenses are legal fees and expert fees.  As of October 2007, Taurus's liabilities ($116,000) are for unpaid legal fees.  From July to November of 2007, invoices from Taurus's liability expert, Tipton Cole, totaled $122,530.  Jerome Johnson is a co-inventor of the '658 patent, and he has a consulting agreement with Orion's lawyers pursuant to which they provided services to Taurus.  Johnson is paid $350 an hour for his time.  As of October of 2007, Orion had paid Johnson approximately $30,000 in consulting fees.

2.  Rulings in this case related to defendants' breach of contract claims

On October 15, 2007, I denied plaintiff's and third party defendants' motions to dismiss defendants' breach of contract claims, explaining that defendants had stated a claim for breach of Section 8.1 of the settlement agreement.  Dkt. #210, at 36-37.  At the same

15

time, I ruled that the license and release provisions of the agreement did not cover the '658 patent.  Id.

On February 25, 2008, I issued the summary judgment order, in which I rejected once again defendants' arguments that the license and release clauses of the settlement agreement could be applied to the '658 patent and rejected defendants' attempt to use the alter ego doctrine to reform the contract to grant a license to the '658 patent.  Dkt. #425, at 42-43. In addition, I dismissed all breach of contract claims against Plutus and Taurus because neither of these parties was engaged in Orion's transfer of the '658 patent.  At the same time, I held that a triable issue of fact remained as to whether Orion had violated Section 8.1 of the agreement when it transferred the '658 Patent to Caelum.

### 3. Spangenberg's involvement in witness tampering

On March 11, 2008, three days before trial of defendants' breach of warranty claims, I heard testimony related to allegations that Spangenberg had been involved in improperly influencing a witness for defendants.  I concluded that Spangenberg had been involved and his involvement warranted sanctions.

### 4. Impact of infringement suit on defendants

Chrysler and Mercedes-Benz have incurred nearly $4 million of fees and expenses in

16

this lawsuit and have devoted many hours of employee time to it, including time in depositions and other discovery.

Defendants' pre-trial witness list identified numerous other Chrysler and MBUSA witnesses, including witness employed by their vendors, to rebut Taurus's claims and establish invalidity of the '658 patent.  Defendants' exhibit list identified hundreds of documents for use at trial. The documents addressed patent defenses, damages and contract breach issues.

Taurus sought extensive discovery, including numerous fact and expert depositions and demands for source code production that is the property of third party vendors.  Among other discovery, Taurus sought and received an order compelling defendants to contact their respective vendors (Trilogy and Critical Mass), who developed the public websites, to obtain their source code.   Trilogy deemed certain of its source code to be core trade secret information and declined to provide it, despite urging from Chrysler.

5.  Outcome of this lawsuit

After a trial, the jury returned a verdict in favor of defendants, finding that Orion had entered an agreement with defendants and had breached a warranty (Section 8.1 of the settlement agreement) that caused defendants to incur fees and expenses in this lawsuit.

E. <u>Orion Related Company Licensing and Litigation Practices</u>

1. <u>General licensing and litigation practices</u>

Orion and other Orion Related Companies are in the business of enforcing their patents through lawsuits and licensing them; their primary operating expenses are legal fees and their primary source of income is from litigation settlements.  The business model of Orion is to license patents through litigation:  first file a lawsuit, then negotiate a licensing agreement as part of settlement.  Orion has been a party to approximately 100 litigation settlement agreements.  As of October 2007, Orion had generated approximately $72.3 million in revenues, primarily from litigation settlements.  At that time Orion had incurred expenses of approximately $20.7 million, most of which was for legal fees, expert fees, court reporters, and other litigation-related expenses.

As manager of the various Orion Related Companies, Spangenberg has offered "portfolio" settlement agreements whereby the patents of multiple Orion Related Companies are licensed.  Commonly, patents owned by related companies that are not parties to the lawsuit are licensed in the settlement agreement.  For example, acting as manager for the entity that owned the '658 patent, Spangenberg authorized two Orion Related Companies that he manages, Triton and Polaris, to enter into a settlement agreement that included a license to the '658 patent, although Triton and Polaris have never owned the '658 patent. Toyota Motor North America entered into a settlement agreement to resolve its involvement

18

in the current litigation. The license is granted by Spangenberg and the "Spangenberg Related Entities" for their past, present and future patents.  The "Spangenberg Related Entities" include almost 20 different companies and Spangenberg's wife and child.

When a settlement includes a grant of licensing rights to patents not owned by the company settling the lawsuit, Spangenberg does not allocate the settlement funds to the different companies according to any reasonable royalty for each patent; rather, he performs a "pro rata" allocation by dividing the settlement funds by the number of his companies identified in the settlement agreement.

2.  Litigation against defendants

On July 24, 2007, an entity called ST Sales Tech Holdings, LLC filed suit against defendants in the District Court in the Eastern District of Texas, alleging infringement of United States Patent No. 6,941,305 (the '305 patent).  ST Sales is controlled by Spangenberg.  In that case the judge granted a protective order prohibiting Orion's outside counsel from viewing "Attorney's Eyes Only" documents after concluding that Spangenberg demonstrated a willingness to sue defendants "over and over" and enforce patents against the same defendants "when he has the capability of doing so." ST Sales Tech Holdings, LLC v. Daimler Chrysler Co., LLC, No. 6:07-cv-00346-LED-JDL, at 11, 16 (E.D. Tx. March 14, 2008).

19

On August 3, 2007, Orion filed another lawsuit against Chrysler in the U.S. District Court in the Eastern District of Texas, alleging that Chrysler's websites infringed the '342 patent and the '627 patent (two of the patents that were the subject of the parties' settlement agreement, infra at p. 12) and asserting that Chrysler was no longer a licensee of those patents. On September 25, 2007, Orion filed another lawsuit against Mercedes-Benz USA in the Eastern District of Texas, alleging that Mercedes-Benz USA's website and its computer systems implemented programs that infringed the '342 and '627 patents and asserting that Mecedes-Benz USA is no longer a licensee of those patents.

## DISCUSSION

### A. Motion for Permanent Injunction (dkt. #510)

Defendants have filed a motion for a permanent injunction that would prohibit Orion, Spangenberg, Taurus and "all persons in active concert and participation with them" from enforcing against defendants the '658 patent and seven other patents held and transferred by Orion before the parties entered into their settlement agreement. Defendants' proposed injunction would be the equivalent of a complete license for those patents, none of which were licensed in the parties' settlement agreement. I have held repeatedly that the settlement agreement does not license the '658 patent because the licensing and release provisions were limited to the patents listed as "Orion Patents." The only breach of contract

20

claim that survived summary judgment and was decided by a jury was whether Orion had breached the representation and warranty in the agreement because it had transferred a patent "related" to the cause of action. Defendants' motion for a permanent injunction, seeking a virtual license for eight patents never licensed and against parties never held to breach the settlement agreement will be denied because defendants have not "succeeded on the merits" for the broad injunction they seek. Plummer v. American Inst. of Certified Public Accountants, 97 F.3d 220, 229 (7th Cir.1996); Cytogenix, Inc. v. Waldroff, 213 S.W.3d 479, 487-88 (Tex. App. 2007).

Defendants prevailed on only a narrow breach of contract issue. The jury found only that Orion's transfer of the '658 patent violated Section 8.1's representation that Orion had not "assigned or otherwise transferred . . . any causes of action . . . or claims . . . relating to" the Texas lawsuits. However, defendants do not seek to enjoin Orion from ever transferring the '658 patent again, they seek to enjoin Orion, Taurus, Spangenberg and "all persons in active concert and participation with them" from enforcing the '658 patent and seven other patents that were not licensed as "Orion Patents." The jury never addressed (1) whether entities other than Orion breached Section 8.1 (because no other entities were parties to the contract) or (2) whether Orion's transfer of any of the seven other patents violated the terms of Section 8.1 (because they were not at issue).

Even if the jury verdict supported such a broad injunctive remedy, defendants have

failed to show that the remedies available at law are inadequate.  Defendants are entitled to

seek breach of contract damages, as they have done in this case, for each additional patent

suit that "triggers" a breach of Section 8.1 by Orion.  To the extent defendants believe that

the Spangenberg entities are bringing frivolous lawsuits, other sanctions are available under

the law, such as sanctions under Rule 11 and attorney fees under 35 U.S.C. § 285 (see

below).  Defendants contend that their remedies at law are inadequate because they will not

be fully compensated for the time and distraction of their employees defending

Spangenberg's lawsuits.  However, defendants are not entitled to injunctive relief simply

because the damages recovered are imperfect.  The damages award must be "seriously

deficient as a remedy for the harm suffered."  Roland Machinery Co. v. Dresser Industries,

Inc., 749 F.2d 380, 386 (7th Cir. 1984).  There is no reason to believe that the lawsuits

brought by Spangenberg and company threaten to hinder defendants' business operations.

Id.  At most, Spangenberg and his entities have become a costly nuisance.  This does not

meet the standard for injunctive relief.  Because defendants have failed to show that they are

entitled to a permanent injunction against Orion and the Spangenberg companies,

defendants' motion for a permanent injunction will be denied.


B.  Spangenberg's Alter Ego Liability

Spangenberg contends that he should not be held liable for Orion's liabilities because

22

there is no evidence that Orion would not pay a judgment against it and because Texas law protects him from this type of liability, namely by (1) shielding managers of limited liability companies completely from any veil-piercing remedy; or at least (2) requiring "actual fraud" instead of "constructive fraud."  Neither of the latter issues has been resolved by the Texas supreme court, which means that in order to decide these issues, I would have to deal with the sometimes thorny issue of predicting what the highest court of the state would determine if the present case were before it now.  Woidtke v. St. Clair County, 335 F.3d 558, 562 (7th Cir. 2003).  Although I am skeptical that Texas law protects Spangenberg in the ways he contends, I need not address these issues.  Defendants have failed to establish that Orion is not likely to satisfy a judgment against it and therefore justice can be served without piercing the corporate veil.

The alter ego test involves two parts: whether "there exists such unity between corporation and individual that the corporation ceases to be separate" and whether "holding only the corporation liable would promote injustice."  Mancorp, Inc. v. Culpepper, 802 S.W.2d 226, 228 (Tex. 1990) (citing Castleberry v. Branscum, 721 S.W.2d 270, 272 (Tex. 1986)).  Because I have concluded that defendants are not entitled to a permanent injunction, defendants' only use for the alter ego doctrine is to establish the personal liability of Spangenberg for the judgment to be entered against Orion.  In this case, the question whether "holding only the corporation liable would promote injustice" reduces to the

23

question whether defendants would be left with an uncollectible judgment against Orion if Spangenberg is not held personally liable.    Mancorp, Inc. v. Culpepper, 836 S.W.2d 844, 846 (Tex. App. 1992) (Mancorp II).

Spangenberg suggests that his sworn declaration that Orion is solvent is enough to protect him from liability.  This argument misses the mark somewhat.  The question is not whether Orion currently *can* pay, but whether plaintiffs "*might* go unpaid" if the veil is not pierced.  Mancorp, 802 S.W.2d at 229 (emphasis added).  Thus, beyond Orion's current solvency, I must consider the likelihood of Orion's becoming insolvent at Spangenberg's hands.

First, I conclude that Spangenberg has managed Orion for his personal gain in disregard of Orion's legal responsibility.  Directed by Spangenberg, Orion breached a contract with plaintiffs by representing that it had not assigned the rights to any cause of action related to the Texas litigations after having transferred the '658 patent.  Rather than talk to defendants to discuss whether the '658 patent was "related" to the settlement as the agreement required, Spangenberg transferred the patent through other entities to a newly formed Wisconsin company to file a new lawsuit against the same defendants.  The chain of transfers from Orion to Taurus appears to have had little to no independent transactional value.  Indeed, Spangenberg admits that he started Taurus for jurisdictional purposes.  Moreover, Spangenberg received a personal benefit from Orion's breach.  As a result of the

24

breach, Orion received a windfall:  it received a settlement payment from defendants who believed they were more protected than they were and at the same time reaped the benefits of the '658 transfer (an intercompany "consideration").  In addition, another Orion Related Company, Taurus, was able to sue defendants for infringement of the '658 patent without having to follow the dispute resolution clause found in the settlement agreement. Undoubtedly, Spangenberg benefits personally from the profits of Orion and the other corporations he manages:   under Spangenberg's management, Plutus has paid as much as $5 million to Spangenberg's company, IP Navigation, for services rendered to the Orion Related Companies; Orion paid $19 million to Plutus for reasons Spangenberg has not bothered to explain; and Acclaim, the company at the top of the pyramid of the Orion Related Companies, is owned by Spangenberg's wife and child.  The success of Orion and the Orion Related Companies translates into successes at Spangenberg's company and at the company owned by Spangenberg's wife and child.  It would be a fantasy to pretend that Spangenberg's only reward from Orion's windfall was his pay as manager.

As questionable as Spangenberg's practices have been, however, the evidence fails to establish that Spangenberg is likely to direct Orion to circumvent clearly established legal obligations such as the judgment to be entered against Orion in this case.  Without such a showing, there is less concern that defendants "might go unpaid" and insufficient basis to grant the equitable remedy that would hold Spangenberg personally liable for the judgment.

25

There is no evidence that Spangenberg has ever before directed any of his entities to avoid paying debts or satisfying judgments.   Even though Spangenberg directed Orion to circumvent what the jury has determined were its contractual duties related to the '658 patent, it is at least arguable that those duties were not clearly established:  there was no explicit license of the '658 patent.  It is one thing to conclude that Spangenberg has used his corporate entities to press the legal limits of his obligations; it is another to conclude that he would be willing to dry up Orion's funds in the face of a judgment against it.   Therefore, although Spangenberg's use of his corporate entities is certainly cause for concern, personal liability is not yet warranted.   Instead, to insure that defendants receive their judgment against Orion, Spangenberg and Orion will be enjoined from dissipating Orion's assets. Unexplained transfers of Orion's assets that result in Orion's insolvency will not be tolerated.

## II.  DAMAGES AND ATTORNEY FEES (DKT. #523)

At the parties' request, I ordered briefing on the amount of damages Orion must pay in the context of a motion for attorney fees filed pursuant to Fed. R. Civ. P. 54.   In defendants' Rule 54 motion, they seek attorney fees from assorted parties on three grounds: (A) from Orion as damages for Orion's breach of contract and under Texas Civil Code § 38.001 as reimbursement for the attorney fees they incurred in litigating their breach of

26

warranty claim against Orion; (B) from Taurus under 35 U.S.C. § 285; and (C) from Taurus, Orion and Spangenberg as a sanction for their trial misconduct. I consider each issue in turn.

### A.   Attorney Fees Requested from Orion for its Breach of Contract

Defendants prevailed at trial on their theory that the attorney fees they incurred defending the patent infringement suit brought by Taurus in this case were incurred as a result of Orion's breach of warranty and therefore proper damages for that breach. Aside from the attorney fees available as damages, defendants seek the "traditional" attorney fees available to prevailing parties in Texas breach of contract suits. Defendants have now submitted an itemization of the costs they claim to have incurred in the course of defending Taurus's patent infringement suit and prosecuting their own breach of contract claims against Orion. In response, Orion offers very little objection to the actual amounts offered by defendants' counsel; instead, it insists that defendants should not receive any damages or attorney fees in this case because several procedural and evidentiary barriers stand in their way. Although Orion asked for this paper trial on the issue of damages, it now contends that it has a Seventh Amendment right to a jury trial; in addition, it contends that defendants must submit expert testimony to prove "reasonable fees" as damages and "usual and customary fees" of the prevailing party and that defendants' expert testimony is inadmissible.

27

Because Orion's procedural and evidentiary objections are not persuasive, defendants will be awarded damages for almost the entire amount they request.

1.  Seventh Amendment right to jury trial

First, Orion objects to determining defendants' damages (which, in this case happen to be attorney fees and costs) in the context of a Rule 54 motion because doing so would violate its Seventh Amendment right to a jury trial on the amount of damages available in a breach of contract suit.  Orion is correct that generally, the Seventh Amendment will apply to the issue of damages in breach of contract suits.  Ross v. Bernhard, 396 U.S. 531, 542 (1970); Simler v. Conner, 372 U.S. 221, 223 (1963); but see Lesikar v. Rappeport, 33 S.W.3d 282, 306 (Tex. App. 2000) (explaining that under Texas law, recovery of attorney fees as damages is "based on equitable grounds").  However, the Seventh Circuit has refused to apply this rationale in the context of determining attorney fees for current litigation arising from contractual provisions.  Rissman v. Rissman, 229 F.3d 586, 588 (7th Cir. 2000) (fees for work done during case should be sought after decision when prevailing party has been identified and it is possible to quantify award); Eastern Trading Co. v. Refco, Inc., 229 F.3d 617, 627 (7th Cir. 2000).  The rule in Rissman must apply in this case.

Even if Rissman did not apply to this case, Orion has waived its right to a jury trial under the present circumstances.  It was Orion that asked for this paper trial on damages in

28

light of my ruling that expert testimony was not required to prove attorney fees as damages, declining the opportunity to try the damages before a jury under those circumstances.  Tr., dkt. #483, at 131-32.  Although Orion was careful not to waive its right to a jury trial generally, it did waive its right to a jury trial to the extent that I hold that expert testimony is unnecessary to prove attorney fees as damages.  Orion cannot now receive a jury trial on a matter that remains exactly as it was when Orion opted for a paper trial.  Because I conclude below that there is no reason to change the ruling that expert testimony is unnecessary to prove damages, Orion is not entitled to a jury trial.

### 2.  Standard for establishing attorney fees damages for breach of contract claim

Next, Orion contends that defendants were required to submit expert testimony to prove they are entitled to damages for their breach of contract claim because Texas law requires that showing.  Defendants maintain that federal law, not state law, governs what evidence is required to establish the elements of a state law breach brought in federal court.

As a general rule, federal courts apply federal rules of evidence and procedure, even in diversity cases.  Milam v. State Farm Mutual Automobile Insurance Company, 972 F.2d 166, 170 (7th Cir. 1992) (citation omitted).  The one exception is "where a state in furtherance of its substantive policy makes it more difficult to prove a particular type of state-law claim, the rule by which it does this, even if denominated a rule of evidence or cast

29

in evidentiary terms, will be given effect in a diversity suit as an expression of state substantive policy."  Id.; see also Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 260 n.31 (1975) (generally, "state law denying the right to attorney's fees or giving a right thereto, which reflects a substantial policy of the state, should be followed").  Such evidentiary rules include the "parol evidence" rule; id.; the statute of frauds, Monetti, S.P.A. v. Anchor Hocking Corp., 931 F.2d 1178, 1181-82 (7th Cir.1991); and certain other "strong common law rule[s]," Barron v. Ford Motor Co. of Canada, Ltd., 965 F.2d 195, 198 (7th Cir. 1992) (under strong common law rule now codified by statute, evidence that plaintiff did not fasten seatbelt inadmissible).  However, where a state's evidentiary rule is "concerned solely with accuracy and economy in litigation" as opposed to "the channeling of behavior outside the courtroom," the rule is purely evidentiary and should not be given effect in federal proceedings.  Barron, 965 F.2d at 199.

Texas law requires the "reasonableness" of attorney fees to be shown by expert testimony.  This "reasonableness" requirement can be traced back to Turner v. Turner, 385 S.W.2d 230, 234 (Tex. 1965), in which the court held that although generally attorney fees may not be rewarded without an express statutory or contractual provision allowing them, attorney fees that are "reasonable and necessary expenses" may be recovered as damages if they were incurred as a result of the defendants' wrongful act.

Under Texas law, the reasonableness of attorney fees must be shown by expert

30

testimony.  <u>Twin City Fire Insurance Co. v. Vega-Garcia</u>, 223 S.W.3d 762, 770 (Tex. App.

2007).  The origins of this requirement are unclear.  Neither party cites any Texas case that

explains why expert testimony must be presented to establish the reasonableness of fees.

Generally, the cases asserting the rule make only conclusory statements on the issue.  <u>See,</u>

<u>e.g.</u>, <u>Twin City</u>, 223 S.W.3d at 770 (citing <u>Woollett v. Matyastik</u>, 23 S.W.3d 48, 52 (Tex.

App. 2000) (citing earlier case) and <u>Barrett v. Parchman</u>, 675 S.W.2d 289, 291 (Tex. App.

1984) (requiring attorney to testify to reasonableness; no discussion why)); <u>Lesikar v.</u>

<u>Rappeport</u>, 33 S.W.3d 282, 308 (Tex. App. 2007) (citing <u>E.F. Hutton & Co. v. Youngblood</u>,

741 S.W.2d 363, 364 (Tex. 1987) (requiring expert testimony; no discussion why); and

<u>Nguyen Ngoc Giao v. Smith & Lamm, P.C.</u>, 714 S.W.2d 144, 149 (Tex. App. 1986)

(implying expert testimony required; no discussion why)).  At least one case suggests that the

only concern behind the requirement is that the evidence of reasonableness be "competent"

and address certain factors.  <u>Brown & Root U.S.A., Inc. v. Trevino</u>, 802 S.W.2d 13, 15

(requiring competent evidence, listing factors relevant to determining reasonableness).

Another case establishes that expert testimony plays a limited role.  <u>Gulf Paving Co. v.</u>

<u>Lofstedt</u>, 144 Tex. 17, 188 S.W.2d 155 (Tex. 1945) (expert testimony generally not

conclusive, the jury may "weigh testimony of the attorneys" and "apply[] to it their own

experience and knowledge of the character of such services").

  Upon reviewing Texas law, I find no reason to believe that the Texas law requirement

31

that expert testimony be presented to show the "reasonableness" of attorney fees is aimed

at "channeling of behavior outside the courtroom"; it is nothing more than a rule aimed at

insuring accuracy and economy.  Because nothing about this rule appears to further any

substantive policy of the state, I turn to the approach used in this circuit to determine the

reasonableness of attorney fees.  The proper approach has been summed up by Judge Posner

in response to a meticulous affidavit questioning "potential excesses" in legal billing:

> Zurich submitted an affidavit by a firm that hires itself out to review lawyers'
> bills and that opined that Taco Bell had overpaid the lawyers who represented
> it in the Wrench litigation. We are unimpressed, as was the district court.
> When Taco Bell hired its lawyers, and indeed at all times since, Zurich was
> vigorously denying that it had any duty to defend—any duty, therefore, to
> reimburse Taco Bell. Because of the resulting uncertainty about
> reimbursement, Taco Bell had an incentive to minimize its legal expenses (for
> it might not be able to shift them); and where there are market incentives to
> economize, there is no occasion for a painstaking judicial review. The affidavit
> of the firm that picked through Taco Bell's legal bills is excruciatingly detailed.
> The amount of time and money that went into its preparation and would be
> incurred in adjudicating its accuracy probably exceeds the potential excesses
> that it identifies.

Taco Bell Corp. v. Continental Casualty Co., 388 F.3d 1069, 1075-76 (7th Cir. 2004)

(citations omitted).  As in Taco Bell, defendants in this case had every incentive to minimize

their expenses.  There was never any certainty that they would be reimbursed for any of their

attorney fees or other litigation expenses.  Even after trial, the issue whether defendants

would receive any attorney fees from Orion remained an ongoing dispute.  In these

circumstances, there is no reason to believe that defendants would have litigated wastefully

at any step of the litigation.

Orion's final argument on damages relates to the scope of the award. Orion contends that defendants are not entitled to expert fees and costs even if they are entitled to attorney fees. However, damages are not limited to attorney fees alone. Where "the natural and proximate consequence of a wrongful act has been to involve a plaintiff in litigation," a plaintiff may recover as damages all "the reasonable expenses incurred in such prior litigation . . . *including* the compensation for attorney's fees." Powell v. Narried, 463 S.W.2d 43, 46 (Tex. App. 1971) (emphasis added). As with attorney fees, the rule in Taco Bell governs: because there was no incentive for defendants to spend more than they had to on litigation expenses, the court will not engage in the painstaking review that Orion demands to see whether the experts were worth their pay or whether the hotels or flights defendants' counsel used were classier than necessary. Orion has not raised any red flags about defendants' actual expenses, as I explain below. Defendants' damages will be determined in accordance with the litigation expenses that they show they have incurred as a result of Orion's breach.

3. Fees and costs available to "prevailing parties" of breach of contract suit under Texas law

Before determining the actual dollar amount Orion must pay defendants as damages for their litigation expenses, I consider defendants' related claim for attorney fees under Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) as the "prevailing party" in their breach of

warranty claim.   Orion contends that defendants do not meet the requirements of a "prevailing party."  To recover attorney fees as a "prevailing party" under § 38.001, a party must "(1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover damages."  Green International, Inc. v. Solis, 951 S.W.2d 384, 390 (Tex. 1997). The Supreme Court of Texas held recently that the right to attorney fees under § 38.001(8) extends to claims for breach of warranty such as defendants' prevailing claim.  Medical City Dallas, Ltd. v. Carlisle Corp., ___S.W.3d___, 2008 WL 1146752, *4-5 (Tex. 2008).  Because attorney fees are recoverable for breach of warranty claims and because I have concluded that defendants are entitled to their litigation expenses as damages in this case, defendants are the "prevailing party" for the purpose of § 38.001.

Next, Orion contends that defendants cannot prove that the fees are "reasonable" as required under Texas law.  Although a prevailing party must establish the "reasonableness" of attorney fees to recover under § 38.001, Hassell Construction Co. v. Stature Commercial Co., 162 S.W.3d 664, 668 (Tex. App. 2005), a rebuttable presumption exists that "the usual and customary attorney's fees for a claim [under §38.001] are reasonable."  Tex. Civ. Prac. & Rem. Code Ann. § 38.003.  Moreover, although the prevailing party may be required to makes some showing of the "usual and customary" fees if the issue is presented to a jury, Lesikar, 33 S.W.3d at 307, when the court takes up the issue of attorney fees, it may take judicial notice of the usual and customary attorney fees under § 38.001.  Tex. Civ. Prac. &

34

Rem. Code Ann. § 38.004; <u>Carlyle Real Estate Ltd. Partnership-X v. Leibman</u>, 782 S.W.2d

230, 234 (Tex. App. 1989).  Because Orion requested this paper trial, the issue of attorney

fees is before the court.  I take judicial notice that the fees defendants' counsel charged for

prosecution of the breach of contract claim were "usual and customary" as required under

§ 38.001.

      In their request for attorney fees, defendants have included a request for the estimated

cost of responding to an appeal that Orion and Taurus are expected to file on the issues of

patent infringement and breach of warranty.  Orion objects, contending that it would be

premature to determine attorney fees at this time.  As defendants point out, a trial court

must award properly estimated appellate attorney fees to the prevailing party under §

38.001.  <u>Hassell</u>, 162 S.W.3d at 669.  At the same time, defendants point to no case that

allows expanding that rule to award appellate fees not related to "prevailing party" fees but

rather to fees awarded as damages from a breach of warranty.  Therefore, I will award

defendants' estimated appellate fees only insofar as they are fees allowed under § 38.001,

that is, fees related to defendants' prosecution of the breach of warranty suit.


4.  <u>Dollar amount</u>

      I now consider the evidence of attorney fees.  Defendants may receive as damages the

attorney fees and expenses they incurred defending Taurus's patent infringement suit and

may receive as attorney fees under § 38.001(8) the attorney fees and expenses incurred in the prosecution of their breach of contract claims.  Defendants have submitted evidence that the following expenses, supported by sworn testimony, are the attorney fees and expenses they incurred defending Taurus's patent infringement suit:

- Kilpatrick Patent Defense Fees:        $1,843,960.90
- Stafford Rosenbaum Fees:        $43,558.86
- Estimated Fees for Patent Appeal:        $165,000.00
- Source Code Escrow Agent Expenses:        $12,331.79
- Expert Fees:        $438,942.75
- Travel Expenses:        $58,307.63
- Copying, Overnight Delivery, Research:  $125,116.13  (Although in some places, defendants stated this amount as $210,126.94, their inconsistencies must be counted against them)

In addition, defendants submit evidence that the following attorney fees, supported by sworn testimony, are the attorney fees and expenses they incurred prosecuting their breach of contract claims:

- Kilpatrick Breach of Contract Fees:        $1,277,087.52
- Estimated Fees for Breach Appeal:        $75,000.00

Orion offers little in the form of a rebuttal related to the itemized fees and expenses.

36

Thus, with the exception of two items, defendants are entitled to these fees and expenses in full.  First, as I explained above, there is no support in the law for defendants' request to recover the $165,000 it estimates to be the fees defendants will incur responding to an appeal in the patent infringement suit.  Second, Orion objects to the amounts asserted by defendants as travel expenses.  As Orion points out, the declarations and exhibits establish only $23,418.42 in travel expenses, not $58,307.63.  Defendants did not respond to this point, which I take as an acknowledgment that defendants miscalculated the amount of travel expenses.  Therefore, defendants are entitled to only $23,418.42 in travel expenses. The total amount of allowable fees and expenses that defendants are entitled to receive from Orion is $3,839,416.37, which includes $2,487,328.85 as damages for defendants' defense of Taurus's patent infringement claim and $1,352,087.52 as an award of attorney fees for their prosecution of their breach of warranty claim.

B.  <u>Attorney fees sought under 35 U.S.C. § 285 against Taurus</u>

Defendants' request for attorney fees does not stop with Orion.  Next, defendants have moved for attorney fees against Taurus under 35 U.S.C. § 285, which provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." Because the fees and expenses to be paid by Orion cover virtually all the expenses defendants incurred in this case, any judgment against Taurus would overlap Orion's obligations.  I find

the following facts to be material.

## FACTS

On March 5, 2007, Taurus was formed under Spangenberg's management in Wisconsin, in part for "jurisdictional reasons."  Five days later, the '658 patent was transferred to Taurus under Spangenberg's management.  Ten days after that, on March 20, 2007, Taurus filed the present suit under Spangenberg's management, alleging infringement of defendants' websites.  Although the '658 patent, entitled "Computer System and Method for Managing Sales Information," is directed to database administration, Taurus asserted claims against defendants on the theory that an internet user of their website could be a "user" of that system.  At trial, Spangenberg described the '658 patent as "go[ing] to the server side of the equation, not the user side of the equation," and "related to the data management that was occurring behind the websites."  Tr., dkt. #482, at 33-34.

On September 9, 2007, I construed certain claim terms, including "user," which I construed to mean "a person who is capable of creating and editing" a set of rules "that governs the relationship between data items within the data model."  Dkt. #242, at 26. Taurus continued to assert its infringement claims, contending at summary judgment that an internet user was a "user" of certain of defendants websites because he could enter a zip code and preferred vehicle configuration to search for products in his area or view

38

"configured" vehicles.  I concluded that Taurus had failed to show that internet users were "users" as required by the only independent claim asserted by Taurus, because the internet user could do no more than plug in variables to be processed in accordance with predefined rules.  Dkt. #425, at 52-56.  The issue of infringement was resolved in five pages of the summary judgment opinion.

In addition, I made it a point to criticize several filings submitted by Taurus and Spangenberg's other companies as no more than a "flat out waste of judicial resources," dkt. #425, at 6-7, and noted that it was not the first time Taurus and Spangenberg's other companies had wasted the court's time, having filed multiple, repetitive motions to dismiss in October, dkt. #425, at 3.

In the same case, Orion, another company run by Spangenberg, lost on a breach of warranty counterclaim brought by defendants because the jury found that Orion's transfer of the '658 patent breached a warranty it had made with defendants in an earlier settlement agreement and that the fees and expenses defendants expended in defense of Taurus's lawsuit resulted from that breach.  Nearing trial in that breach of warranty suit, Spangenberg engaged in sanctionable behavior by inducing Patrick Anderson to improperly attempt to influence a witness.

39

DISCUSSION

The test for determining whether to award attorney fees under § 285 is a two-step process.  Cybor Corp. v. FAS Technologies, Inc., 138 F.3d 1448, 1460 (Fed. Cir. 1998).  The first step is a factual determination of whether the case is "exceptional"; the second step is a determination whether, in the court's discretion, attorney fees are appropriate.  Id.  The "characterization of the case as exceptional must be established by clear and convincing evidence."  Brooks Furniture Mfg., Inc. v. Dutailier Intern., Inc., 393 F.3d 1378, 1382 (Fed. Cir. 2005).

Factors relevant to determining whether a case is "exceptional" include "closeness of the question, pre-filing investigation and discussions with defendant, and litigation behavior."  Computer Docking Station Corp. v. Dell, Inc., 519 F.3d 1366, 1379 (Fed. Cir. 2008) (citations omitted).  Moreover, a case may be exceptional where the losing party has "prolong[ed] litigation in bad faith."  Id.; see also Hughes v. Novi American, Inc., 724 F.2d 122, 125 (Fed. Cir. 1984) (attorney fees may be awarded for continuance of suit in bad faith or other misconduct during trial).  Section 285 aims to prevent "gross injustice" resulting from bad faith litigation, Beckman Instruments Inc. v. LKB Produkter AB, 892 F.2d 1547, 1552 (Fed. Cir. 1989), and to deter parties from bringing "clearly unwarranted suits." Mathis v. Spears, 857 F.2d 749, 754 (Fed. Cir. 1998).

First, the pre-filing investigation of Taurus's suit was deficient.  A plaintiff asserting

40

patent infringement while remaining "manifestly unreasonable in assessing infringement"
acts in bad faith that may be grounds for finding a case to be "exceptional." Eltech Systems
Corp. v. PPG Industries, Inc., 903 F.2d 805, 809-10 (Fed. Cir. 1990); see also Antonious v.
Spalding & Evenflo Companies, Inc., 275 F.3d 1066, 1075 (describing pre-suit investigation
duty in the context of Fed. R. Civ. P. 11).  Taurus alleged infringement of the '658 patent
by software run on defendants' websites that allowed an internet user to enter a zip code to
view local dealers and "configure" cars based on available options.  Spangenberg described
the patent as a "server-side" patent related to data management happening "behind the
websites."  From the start, Taurus's theory that an internet user could perform server-side
data management was a long shot; had Taurus (and company) performed a sufficient pre-
filing investigation, the shortcomings of that theory should have been apparent.

Even assuming that Taurus was entitled to test its long-shot theory before a court, it
should have thrown in the towel after I construed the term "user" as being limited to
someone who could create or edit rules within the data model.  Instead, Taurus persevered,
contending that an internet user "created or edited rules" by plugging in variables that the
program would process.  Taurus continued litigating its position through the party's motions
in limine.  Taurus's decision to proceed in the face of this court's constructions prolonged
the litigation in bad faith.  Computer Docking Station, 519 F.3d at 1379; DePuy Spine v.
Medtronic Sofamor Danek, Inc., 534 F. Supp. 2d 224, (D. Mass. 2008) (failure to accept

claim construction governing case can lead to finding of exceptional case); <u>Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersystems GmbH</u>, 2008 WL 410413, *5 (D. Colo., Feb. 12, 2008) (after receiving unfavorable claims construction ruling, party had "duty to reexamine litigation and make an objective assessment" of its infringement claims).

Moreover, Taurus's long-shot infringement suit was carried out vexatiously.  Through Orion, Spangenberg had reached a settlement agreement with defendants in a lawsuit brought in Texas related to other patents.  Rather than discuss his contentions about the '658 patent with defendants and consider whether another lawsuit would breach the settlement agreement, Spangenberg set up Taurus in Wisconsin for "jurisdictional reasons," gave Taurus the '658 patent and filed a patent infringement suit against defendants, a move that the jury found constituted Orion's breach of the settlement agreement.  Throughout the lawsuit, Taurus and Spangenberg's other companies filed repetitive motions with repetitive arguments, wasting the time of both the court and defendants.  Finally, nearing the end this drama and facing liability for the breach of the settlement agreement, Spangenberg directed another lawyer to engage in witness tampering.  (By this time, Taurus was out of the case; nevertheless, Spangenberg's behavior occurred in the wake of the infringement suit, which was the subject of defendants' breach of warranty counterclaim.)

It was a gross injustice for defendants to have to expend resources on this suit at all. Taurus's use of the court to bully settlement on baseless claims is an abuse of the judicial

42

system.  Therefore, I conclude that this case is exceptional.  Moreover, I conclude that defendants should be awarded attorney fees for their defense of Taurus's patent infringement suit.  The fact that defendants will be "made whole" for their defense of Taurus's suit in the judgment to be entered against Orion does not mean that Taurus should avoid liability.  Taurus will be held jointly and severally liable with Orion to the extent of the fees and expenses defendants incurred defending Taurus's patent infringement suit.

The only question remaining is the actual amount defendants may receive as "reasonable fees" from Taurus under § 285.  A prevailing party may receive both attorney fees and other fees and expenses "that the prevailing party incurs in the preparation for and performance of legal services related to the suit." Central Soya Co. v. Geo. A. Hormel & Co., 723 F.2d 1573, 1578 (Fed. Cir. 1983).  Generally, a party requesting attorney fees must offer "some evidence to support the reasonableness" of the fees, including the billing rate charged and the number of hours expended.  Lam, Inc. v. Johns-Manville Corp., 718 F.2d 1056, 1068 (Fed. Cir. 1983).  However, at least where the nonmoving party fails to make a "real challenge" concerning the actual amount of fees claimed, the court need not pore over time records, expense statements and other documentation to determine the reasonableness of the expenses, billing rates and number of hours expended.  Id.; see also Taco Bell, 388 F.3d at 1075-76 (painstaking judicial review of reasonableness of attorney fees and expenses not necessary where market incentives exist to keep costs down).

43

In this case, Taurus's only objection to the actual amount requested by defendants is defendants' apportionment of those fees before and after this court's claim construction order. I have concluded that defendants are entitled to fees for the entire case; this moots Taurus's only objection to the amounts requested. Because Taurus makes no other objections to the amount of fees and expenses requested, and because defendants have submitted proper documentation of their expenses, billing rates and hours expended, defendants will be awarded the full amount requested, $1,644,906.12.

### C. Motion for Sanctions Against Orion and Spangenberg

Finally, defendants request sanctions against Taurus, Orion and Spangenberg for the trial costs and expenses incurred by defendants for their "litigation misconduct." Defendants contend that additional sanctions are warranted because (1) Spangenberg, Mike Newton and David Pridham misrepresented Taurus's infringement contentions at trial so that Orion could avoid liability for its breach of warranty; (2) Newton tried to evade the court's rulings on motions in limine; and (3) Spangenberg engaged in improper behavior by directing Anderson to improperly influence a witness.

I have already ordered sanctions against Orion and Spangenberg for Spangenberg's role in Anderson's witness tampering. Nothing about defendants' contentions persuades me that I should add further sanctions for that behavior or that the other behavior was

44

sufficiently egregious to warrant additional sanctions.  Therefore, defendants' motion for additional sanctions will be denied.


III.  MOTION FOR RELIEF FROM SUMMARY JUDGMENT ORDER (DKT. #494)

Taurus has filed a motion to alter or amend the judgment under Fed. R. Civ. P. 59(e) or alternatively for relief from the summary judgment order under Fed. R. Civ. P. 60(b) with respect to the ruling that certain claims of the '658 patent are invalid as anticipated.  Taurus does not object to the application of the law to the facts at summary judgment, but asks only that I revisit my ruling of invalidity in light of "new evidence" it has discovered related to the date of invention of the '658 patent.  Such a request is best construed as a motion under Rule 60(b)(2).  That rule is an "extraordinary remedy" that is "designed to address mistakes attributable to special circumstances and not merely to erroneous applications of law." Russell v. Delco Remy Division of General Motors Corp., 51 F.3d 746, 749 (7th Cir. 1995) (citations omitted).  Taurus is not entitled to relief from the summary judgment order on the basis of new evidence unless (1) the evidence was discovered following the summary judgment order; (2) Taurus exercised due diligence to discover the evidence; (3) the evidence is not cumulative or impeaching; and (4) the evidence is material.  Jones v. Lincoln Electric Co., 188 F.3d 709, 732 (7th Cir. 1999).

The "new evidence" includes testimony and exhibits from a deposition of Tor

45

Stenstad taken by Hyundai in Case No. 07-cv.-477-bbc, a separate case filed by Taurus, asserting infringement of the '658 patent by different defendants.  Stenstad was a former employee of Clear With Computers, a company owned by the co-inventor of the '658 patent, Jerome Johnson (who also happens to be Taurus's consultant).  Although I doubt the materiality of this new evidence, I need not reach that issue because Taurus failed to exercise due diligence to discover the evidence and, when it was discovered, failed to advise the court of its relevance before the summary judgment order was released.

As Taurus admits, in preparation of its positions on summary judgment, it deposed the inventors and communicated with the lead developer of the product embodying the invention claimed in the '658 patent, Mark Peterson.  After determining that Peterson had no corroborating materials, Taurus declined to look for other employees to determine what they knew and what materials they had.  It was only by luck that Taurus discovered corroborating materials in the Stenstad deposition, which had been arranged by Hyundai. The fact that Hyundai managed to discover Stenstad when Taurus, working with the inventors and owners of Stenstad's former company, did not, speaks volumes about Taurus's diligence.

In addition, the evidence was discovered before the summary judgment order was entered but not brought to the court's attention until later.  Taurus was served an initial notice for the Stenstad deposition on December 28, 2007, before it filed its brief in

46

opposition to summary judgment.  Stenstad's deposition occurred on January 28, 2007, nearly one month before the summary judgment order was released.  Rather than attempt to supplement the summary judgment record with the new evidence at that time, Taurus simply filed the deposition transcript, dkt. #378, and later mentioned the evidence in the context of opposing defendants' motions in limine, dkt. #420.  It was not until after the summary judgment order was released that Taurus attempted to connect the evidence to its position at summary judgment.

In light of these circumstances, Taurus is not entitled to relief under Rule 60(b).  It had its opportunity to gather evidence to show an earlier filing date for the '658 patent before summary judgment and it failed to unearth the evidence and bring it to my attention in a timely manner.  Parties are not entitled to a "do over" every time they happen upon something new in places they didn't bother to look before.  Taurus's Rule 60(b) motion will be denied.

## IV.  MOTION FOR RECONSIDERATION OF RULING ON WITNESS TAMPERING AND FOR MISCELLANEOUS RELIEF (DKT. #523)

Orion and Spangenberg have moved for reconsideration of the imposition of sanctions on them for Spangenberg's involvement in Patrick Anderson's attempt to influence a witness.  In addition, they request the transcript of the sealed proceedings and request leave to

47

undertake additional discovery on defendants' pretrial conduct. Because Spangenberg and his attorney induced Patrick Anderson to intimidate a witness on the eve of trial to further Orion's defense, it was appropriate to sanction Spangenberg and Orion for that activity; therefore, Orion and Spangenberg's motion for reconsideration will be denied. Moreover, Orion and Spangenberg's request for additional discovery is no more than an untimely attempt to resolve a discovery dispute; therefore, it will be denied. Finally, because defendants have offered a redacted version of the transcript for the in camera hearing that addresses Orion's and Spangenberg's concerns, the request for an unredacted transcript of the sealed proceeding and letter will be denied as unnecessary.

## A.  Motion for Reconsideration of Witness Tampering Ruling

First, Spangenberg and Orion have moved for reconsideration of the ruling that Spangenberg engaged in sanctionable behavior related to Anderson's call to Butler on the eve of trial. Sanctionable conduct must be shown by clear and convincing evidence. Ty Inc. v. Softbelly's Inc., 517 F.3d 494, 498-99 (7th Cir. 2008). From the evidence presented at the hearing, I find the following material facts.

FACTS

48

Patrick Anderson is a 2005 graduate of the Michigan State Law School.  Before he graduated, he started working at the law firm of Dickinson Wright in Detroit, where he was placed in-house with Chrysler as a contract attorney, helping with the prosecution of patents. He continued to work for Chrysler in the same capacity after his graduation.  At Chrysler, he took direction from Dickinson Wright and two Chrysler lawyers working in the field of patent prosecution, neither of whom was Sean Butler.

While employed by Chrysler, Anderson worked on litigation against Chrysler and other automotive companies brought by Orion in Texas.  Anderson understood that everything he learned at Chrysler was confidential.

Anderson wanted to continue working at Chrysler but was not offered the opportunity.  He left Chrysler in May 2006 and returned to Dickinson Wright.  In October or November 2006, Anderson received an email from a lawyer working for Spangenberg, apparently in response to an email that Anderson had sent responding to a notice of a job opening with Intellectual Property Navigation, one of Spangenberg's firms.  Anderson emailed the firm his résumé, which included the information that he had worked for Chrysler.  He received a return email from Spangenberg, asking him to fly to Dallas for an interview with the firm.  The interview did not result in a position at that time.

On March 20, 2007, Taurus filed this lawsuit against Chrysler and Merdedes-Benz USA.  Chrysler and Mercedes-Benz filed third-party claims against Spangenberg and Orion,

among others.    The third-party defendants moved to dismiss; their motion was denied in large part on October 15, 2007.  About the same time, Anderson received a telephone call from Spangenberg, this time with a job offer.

Anderson accepted Spangenberg's offer after checking with other lawyers about doing so.  He was not hired directly but as a member of an independent law firm that Anderson created for the purpose of obtaining work from Spangenberg and Spangenberg's companies. Anderson's entire income is derived from Spangenberg and it is significantly more than he was making at Dickinson Wright, enough to convince Anderson to uproot his family from Michigan and open a solo "firm" in Texas, a state where even now he is not licensed to practice law.  The terms of his engagement are at will.

On March 6, 2008, this court held a late afternoon telephone conference to take up Orion and Spangenberg's motion to strike defendants' damages claims.  At that hearing, I directed Orion and Spangenberg to make a written offer of proof on the question of what defendants knew about the '658 patent before they signed the settlement agreement with Orion.  I explained that "the fact that [the '658 patent] was turned over to Chrysler as discovery is not sufficient.  I have to know that someone at Chrysler saw it and knew what it meant." Tr., Mar. 6, 2008 hearing, dkt. #467, at 12.

That same evening, Spangenberg called Anderson and told him that he suspected that Sean Butler, one of Chrysler's witnesses, was going to commit perjury.  Spangenberg

reminded Anderson that Butler and Anderson had worked together at Chrysler and had "in all likelihood" been friends.  In addition, Spangenberg warned Anderson that he may want to consider whether it could "cause some kind of problems" for Anderson to not take steps to "deal with" the perjury, considering that Anderson had formerly worked with Butler.  Tr., Mar. 11, 2008 hearing, dkt. #484, at 53-54.  Curious about what was going on, Anderson called Mike Newton, one of Orion's and Spangenberg's lawyers in this case to find out. Newton told Anderson to read the summary judgment opinion in this case.

Anderson took immediate action.  By 3:13 p.m. the next day, he had obtained the summary judgment opinion from PACER, read the opinion (73 pages long), researched the local rules of ethics, contacted a state bar hotline and contacted an attorney for ethical advice, drafted a letter to Sean Butler and searched for Butler's telephone number on the Michigan bar website.

Next, Anderson called Butler.  During the phone call, Anderson asked Butler whether he would be testifying in this case.  Butler replied that it was up to defendants.  Anderson asked Butler to stay on the phone because Anderson was sending him an email and wanted to be sure that Butler received it.  Anderson attached the letter he had drafted to Butler.  In the letter, Anderson stated that he had reviewed the summary judgment order in this case and noticed that it appeared that "Chrysler is representing that it was not aware of two separate licensing options that were being offered, and that it was not aware that the '658

51

patent was transferred away from Orion IP prior to the settlement." The letter continued,

> Assuming you plan to testify at the trial, I want to take some time to remind you of certain facts:

> [Facts are redacted as privileged and work product.]

> Pursuant to [Michigan Rules of Professional Conduct] 3.3 if I learn that a client or former client plans to give false testimony I am obligated to persuade the client to testify truthfully. If the client refuses, I am obligated to take subsequent remedial measures. Additionally, pursuant to obligations under [Michigan Rules of Professional Conduct] 8.3, I must report conduct that raises a substantial question to a lawyer's fitness to practice law.

> . . .

> Please contact me and assure me that you will testify truthfully on all matters asked during your testimony, no later than 9 AM, Monday March 10, 2008. I will treat lack of assurance as an indication that you will not testify truthfully and will be forced to take subsequent remedial measures. Further, if I am advised later that you do give false testimony, I will be obligated to report your conduct to the state bar.

At no time did Anderson ever ask Butler what his recollection was of the "certain facts" or attempt to discuss what he believed to be conflicts between Anderson's recollection of the facts and Butler's. During the phone call, Butler asked Anderson for whom he worked and how he had found out about the summary judgment opinion in this case. Anderson refused to reveal his employer (or client) and did not disclose that Newton had told him about the summary judgment opinion, instead telling Butler that it was "all over the internet."

Anderson made the call and sent the email from Spangenberg's office, using

52

Spangenberg's equipment.  Anderson testified that he did not consult with anyone before drafting his letter or sending the email.

Over that same weekend, Anderson prepared a declaration for the court, saying that he believed that defendants were untruthful when they stated in an interrogatory that the only analyses conducted of the '658 patent were conducted after Taurus filed its lawsuit against defendants in this case.  The declaration was filed about 1:30 a.m. on Monday, well before the 9 a.m. deadline Anderson had set for Butler to contact him.  It was submitted in support of Orion's offer of proof.

(During a sealed portion of the hearing, only defendants' attorneys were allowed to stay in the room to hear Anderson's testimony about what he believed had happened at Chrysler while he worked there.  Defendants have agreed to release a redacted version of that sealed hearing, from which I draw the following facts.)

The "facts" stated in Anderson's letter to Butler relate to an event that occurred more than two years before his phone call to Butler.  According to Anderson, he recalls that he was asked to run a search for a particular outcome, and for a particular reason.  He did not document that search, or make any notes of it.  Moreover, a printout of Anderson's emails and directory files for Chrysler shows that although Anderson would download patents for projects that he worked on, save them to his system and email them to others at Chrysler, he did none of these things in connection with this supposed search.  In addition, Anderson

53

admits that the search was outside his normal job duties and would have been the only one of its kind that he did while at Chrysler.

DISCUSSION

Spangenberg and Orion contend that it was error to impose sanctions on them for Patrick Anderson's communications with Butler because I could not have found by clear and convincing evidence that Spangenberg engaged in "witness tampering" as it is understood in Texas criminal law. The court has an inherent authority to regulate litigants' behavior during litigation and impose sanction where necessary. Ty Inc., 517 F.3d at 498-99. Although Spangenberg and Orion are correct that the court must find sanctionable conduct by "clear and convincing evidence," id., the conduct need not be criminal; the court may impose sanctions whenever a "party act[s] in bad faith, vexatiously, wantonly, or for oppressive reasons." Corley v. Rosewood Care Center, Inc., 142 F.3d 1041, 1058 (7th Cir. 1998) (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 45-46, 50 (1991)) (internal quotations omitted).

Use of intimidation to influence witness testimony is unacceptable and demonstrates "bad faith" use of the judicial system. Lightning Lube, Inc. v. Witco Corp., 144 F.R.D. 662, 668 (D.N.J. 1992) (lawyer's attempt to induce witnesses to testify favorably was improper influence of witnesses' testimony egregious enough to preclude Rule 11 sanctions against

54

opposing party); <u>Hill ex rel. Hill v. McNairy County Board of Education</u>, 229 F.R.D. 563, 566 n.2 (W.D. Tenn. 2004) (attorney's threat to seek criminal charges against expert if he attempted to evaluate student was "extreme and inappropriate"; <u>Amari Co., Inc. v. Burgess</u>, ___F. Supp.2d___, 2008 WL 656072, *6 (N.D. Ill. 2008) (noting that attempts to harass, threaten or improperly influence testimony are sanctionable conduct).  Contrary to Orion's and Spangenberg's contentions, it matters little whether Anderson's intimidation was an attempt to get at the truth or manufacture a lie; the Federal Rules of Procedure provide the tools a party may use during litigation to search for the truth.  Even when these tools fall short of reaching that goal, a party is not entitled to resort to harassment.

Turning to this case, the evidence that Spangenberg engaged in sanctionable behavior is clear and convincing.  The timing and nature of Anderson's call and letter to Butler leave no doubt that Anderson's call and letter were intended to intimidate Butler.  In light of Spangenberg's relationship with Anderson, his call to Anderson suggesting that Anderson act to prevent "perjury" was wholly inappropriate and warrants sanctions.

First, Anderson's communication with Butler was designed to intimidate Butler and influence his testimony.  Anderson provided a list of detailed facts to Butler and threatened to report him to the local bar if he did not testify accordingly.  At no time did Anderson ever attempt to reconcile his recollection of the two-year-old facts with Butler's or explain to Butler why he remembered the facts as he did.  Moreover, Anderson lied about how he found

out about the summary judgment and refused to tell Butler who he was working for.  The letter included an explicit threat to report Butler to the state bar and gave a deadline for Butler to promise to testify accordingly, with no other options listed.  No reasonable lawyer would ignore a threat to be reported to the state bar.  Although I have my doubts about Anderson's version of the "certain facts" he lists in his letter, I need not consider whether Anderson was correct about his memory of what had happened at Chrysler.  His call was improper and made for the purpose of intimidation.

Next, Spangenberg's relationship with Anderson and his involvement in Anderson's witness tampering show that Spangenberg intended Anderson to improperly influence Butler's testimony and that he put Anderson up to unethical behavior for Spangenberg's (and Orion's) benefit.  Spangenberg knew Anderson had worked with Chrysler before, but called him nonetheless to "warn" him that Butler might "perjure" himself and to suggest that Anderson might have an ethical duty to prevent Butler from testifying that way.

Two key problems are apparent in Spangenberg's call.  First, having worked for Chrysler previously, Anderson should have been behind a Chinese wall; under no circumstances should Spangenberg or Newton have informed Anderson about the case in light of his conflict.  Second, Spangenberg's suggestion that Anderson might have an ethical duty to act to stop Butler's perjury was manipulative and improper.  This call was nothing more than a veiled order from a powerful employer.  Anderson was newly out of school and

56

financially dependent on Spangenberg at the time.   He responded to Spangenberg's suggestion to act in a way that went well beyond even any imagined ethical duties to act, but was in accordance with Spangenberg's immediate interests.  After talking with Spangenberg and Newton, Anderson immediately directed all of his energies to taking the "steps" necessary to stop the "perjury."  Anderson worked that night researching ethics, preparing the letter and finding and contacting Butler and worked that weekend to prepare a declaration in time for Spangenberg to use it in his offer of proof.  Oddly, Anderson did not even wait until the deadline for Butler to reconcile his story before submitting his declaration to this court implying that Butler's testimony was false.

Spangenberg's involvement in this drama suggests other problems.   Why did Spangenberg wait so long to hire Anderson, and hire him when he did?  Why would Spangenberg even have a real concern that Butler was about to commit perjury, unless Anderson had already violated the ethical rules governing confidentiality?

In conclusion, Spangenberg and Orion deserve sanctions for Spangenberg's role in Anderson's witness intimidation.  Because the incident was closely related to the offer of proof designed to determine whether Spangenberg and Orion could offer a defense that defendants did not rely on the warranty found in the settlement agreement, a sanction preventing Spangenberg and Orion from offering that defense at trial was proportionate to the sanctionable behavior and appropriate under the circumstances.  Therefore, Orion's and

Spangenberg's motion for reconsideration of this issue will be denied.

### B. Motion for Leave to Conduct Additional Discovery

Next, Orion and Spangenberg request leave to conduct additional discovery under Fed. R. Civ. P. 16(b) on the issue of what defendants and their attorneys knew about the '658 patent at the time they signed the settlement agreement.  Orion and Spangenberg contend that the additional discovery is justified in light of defendants' comment on the eve of trial that "Chrysler has acknowledged that it knew Orion transferred the '658 patent," and would be relevant to their defense of defendants' breach of warranty claim, alter ego claim and the question whether the case was "exceptional" under § 285.

Under Rule 16(b)(4), a party may request leave to conduct additional discovery beyond the date set in the court's scheduling order, but "only for good cause."  To establish "good cause" to reopen discovery, a party must show that, even having exercised due diligence, it could not have reasonably met the discovery deadline.  See, e.g., AMW Material Testing, Inc. v. Town of Babylon, 215 F.R.D. 67, 71 (E.D.N.Y. 2003) (citation omitted). In other words, the relevant question is whether Spangenberg and Orion could have unearthed before what they are seeking to unearth now had they exercised due diligence.

Orion and Spangenberg make much of defendants' statement that defendants "have acknowledged" the transfer of the '658 patent, acting as though the statement covered new

58

ground.  It did not.  In defendants' amended complaint, they state that they had received

the '658 patent in discovery.  The key question is whether defendants knew the significance

of the '658 patent at the time of settlement so that they are barred from claiming reliance

on the warranty in the settlement order.  This information about defendants' understanding

of the '658 patent is what Orion and Spangenberg say were unable to unearth during

discovery, in spite of deposing defendants' attorneys and posing questions in interrogatories.

Orion and Spangenberg complain that at the time they were "stonewalled" by defendants

from conducting more complete discovery on the issue.  Such arguments are nothing more

than untimely discovery dispute.  If Orion and Spangenberg were dissatisfied with the

answers they received from defendants at the time, they should have raised the issue before

the magistrate judge and resolved it in a timely fashion.  There is no good reason to reopen

discovery now to take up these issues.  Because Orion and Spangenberg have failed to

demonstrate that they could not have conducted the discovery they request within the

deadlines, they will be denied leave to conduct additional discovery now.


C.  Motion to Compel Unredacted Versions of Anderson Letter and Transcript of In

Camera Hearing

Finally, Orion and Spangenberg move to compel disclosure of unredacted versions of

the letter sent by Anderson and the transcript of his in camera examination, contending that

59

they should be allowed to view the evidence I relied upon to find that Spangenberg engaged in sanctionable behavior.  Defendants have offered a redacted version of the transcript that makes available all the information I have found to be relevant to imposing sanctions on Spangenberg.  Because this redacted transcript addresses the concerns of Orion and Spangenberg, I will release it as defendants have agreed and deny Orion and Spangenberg's requests for unredacted versions of the letter and transcript.

ORDER

IT IS ORDERED that:

1. Defendant Chrysler, LLC's and Mercedes-Benz USA Inc.'s motion for permanent injunction (dkt. #510) is DENIED;

2.  Plaintiff Taurus IP, LLC's motion for relief (dkt. #494) from the summary judgment order is DENIED;

3.  Third party defendants Orion IP, LLC's and Erich Spangenberg's motion for reconsideration (dkt. #523) of the imposition of sanctions on them is DENIED;

4.  Third party defendants Orion IP, LLC's and Erich Spangenberg's motion to conduct additional discovery (dkt. #523) is DENIED;

5.  Third party defendants Orion IP, LLC's and Erich Spangenberg's motion to compel disclosure of unredacted copies of the Anderson letter and the transcript for the in

camera hearing (dkt. #523) is DENIED.

6.  The clerk is directed to make document #543 available to third party defendants Orion IP, LLC and Erich Spangenberg; however, the document shall remain sealed to the general public.

7.  Defendants Chrysler, LLC's and Mercedes-Benz USA, Inc.'s motion for attorney fees (dkt. #521) from third party defendant Orion IP, LLC is GRANTED in the amount of $3,839,416.37;

8.  Defendants Chrysler, LLC's and Mercedes-Benz USA Inc.'s motion for attorney fees (dkt. #521) from plaintiff Taurus IP, LLC under 35 U.S.C. § 285 is GRANTED in the amount of $1,644,906.12;

9.  Defendants Chrysler, LLC's and Mercedes-Benz USA Inc.'s motion for additional sanctions (dkt. #521) against plaintiff Taurus IP, LLC and third party defendants Orion IP, LLC and Erich Spangenberg is DENIED;

10.  Third party defendants Orion IP, LLC and Erich Spangenberg are ENJOINED from transferring, disbursing or otherwise depleting Orion's assets, directly or indirectly, except as necessary to carry on Orion IP, LLC's normal business operations of purchasing, enforcing and licensing patents, until Orion IP, LLC has satisfied the judgment to be entered against it in this case.

11.  The clerk is directed to enter judgment for defendants Chrysler, LLC and

61

Mercedes-Benz USA, Inc. and against plaintiff Taurus IP, LLC and third party defendant

Orion, jointly and severally, in the amount of $1,644,906.12.   In addition, the clerk is

directed to enter judgment for defendants Chrysler, LLC and Mercedes-Benz USA, Inc. and

against third party defendant Orion in the amount of $2,194,510.25 and close this case.

Entered this 3d day of June, 2008.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

62